[L.A. No. 32114. Jan. 2, 1987.]

HARLAN YOUST, Plaintiff and Appellant, v.
GERALD LONGO, Defendant and Respondent.

**COUNSEL**

Edward Freidberg, Marjorie E. Manning, Rex-Ann S. Gualco and R. Parker White for Plaintiff and Appellant.

Sheryll Layne Myrdall for Defendant and Respondent.

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, Talmadge R. Jones, Deputy Attorney General, Roger D. Smith, Christopher S. Rooney and Jackson & Nash as Amici Curiae.

**OPINION**

**LUCAS, J.**—Is a racehorse owner entitled to tort damages when the harness driver of another horse[1] negligently or intentionally interferes with the owner's horse during a race, thereby preventing the owner from the chance of winning a particular cash prize? ■ It is a well-settled general tort principle that interference with the *chance* of winning a contest, such as the horserace at issue here, usually presents a situation too uncertain upon which to base tort liability. We agree that application of this principle should govern here. Further, even if the outcome of the race was certain, as a matter of public policy, we conclude that an action for interference with prospective economic advantage, occasioned as a result of allegedly tortious conduct occurring during a sporting contest, ordinarily will not lie. Finally, the Court of Appeal concluded that the California Horse Racing Board (the Board) has jurisdiction to award affirmative relief for the alleged tort liabili-

---

[1] The following distinction in horseracing terminology is relevant here: The California Administrative Code, title 4, section 1420, defines "jockey" as a "race rider" and "driver" as "one who drives and controls the horse from a seated position on a two-wheel vehicle." As the instant case involves a harness race, "driver" is the appropriate term.

ty here. In order to clarify its duty, we hold that the Board has no authority to award compensatory or punitive damages for tortious interference with a horserace.

## I. FACTS

Plaintiff Harlan Youst entered his standardbred trotter horse, Bat Champ, in the eighth harness race at Hollywood Park in Inglewood, California. Also entered in the race was The Thilly Brudder, driven by defendant, Gerald Longo. During the race, defendant allegedly drove The Thilly Brudder into Bat Champ's path and struck Bat Champ with his whip, thereby causing the horse to break stride. Bat Champ finished sixth while The Thilly Brudder finished second. The Board reviewed the events of the race and disqualified The Thilly Brudder, which moved Bat Champ into fifth place, entitling plaintiff to a purse of only $5,000.[2]

Plaintiff filed a complaint for damages against defendant in the Los Angeles Superior Court, asserting three causes of action: (1) defendant *negligently* interfered with Bat Champ's progress in the race;[3] (2) defendant *intentionally* interfered therewith; and (3) defendant and unidentified individuals (Does I through X) *conspired to interfere.* Plaintiff sought as compensatory damages the difference in prize money between Bat Champ's actual finish and the finish which allegedly would have occurred but for defendant's interference. Plaintiff requested compensatory damages in three alternative amounts, namely, the purse amount for either first, second *or* third place (less the fifth place prize of $5,000 which Bat Champ has already received). Ascertainment of the amount of actual damages apparently would require a finding as to the position in which Bat Champ would have finished but for defendant's interference. Punitive damages of $250,000 were also sought.

Defendant demurred, asserting lack of subject matter jurisdiction by the superior court and failure to state a cause of action in each count of the complaint. The trial court sustained the demurrer without leave to amend on the latter ground. Plaintiff appealed from the judgment of dismissal. The Court of Appeal affirmed.

The Court of Appeal held that, as a matter of law, the facts did not invoke the tort of *negligent* interference with prospective economic advan-

---

[2] The purse for the race was $100,000 distributed as follows: the winner received $50,000; second place received $25,000: third place received $12,000; fourth place received $8,000; and fifth place received $5,000.

[3] At oral argument, counsel for plaintiff confirmed that he had waived any claim for *negligent* interference with prospective economic advantage.

tage. The court also held that, given the special circumstances surrounding sports competition, and as a matter of public policy, plaintiff's allegations of *intentional* interference with prospective economic advantage were insufficient to state a cause of action. However, the third cause of action, alleging a civil *conspiracy* to intentionally interfere with prospective economic advantage, could be actionable in the context of a horserace competition.[4] Nevertheless, the court concluded that the third count failed to state a cause of action because plaintiff did not petition the Board for such relief and, therefore, had not exhausted his administrative remedies before the Board.

The Court of Appeal was unanimous in holding that the Board has the authority to award tort compensation for the type of injury alleged in the third count and could enforce any award against licensees and nonlicensees of the Board. The court directed the Board to waive any time limits which may have expired with respect to hearing plaintiff's claim of a conspiracy to intentionally interfere with his prospective economic advantage. This directive was deemed appropriate because, as the Board conceded, Board policy and practice precluded awarding such affirmative compensatory relief when plaintiff first filed his complaint and the trial court sustained the demurrer.[5]

## II. The Parties' Contentions

The Court of Appeal ruled that a tort for civil conspiracy to intentionally interfere with prospective economic advantage may exist in the context of a sporting event, but initially only the Board may award compensation where such interference occurs during a horserace. Plaintiff challenges this holding on two grounds.

First, plaintiff contends that the Court of Appeal erred in affirming dismissal of count two of his complaint, which alleges that defendant *intentionally* interfered with plaintiff's horse. Plaintiff argues that this cause of action should be available when intentional conduct proscribed by horseracing rules results in economic loss. As discussed below, the Court of Appeal held that only the *act of conspiring* alleged in count three of the complaint

---

[4] The Court of Appeal observed that the conspiracy allegation of the complaint was inappropriate and misleading because it incorporated paragraphs of the first and second counts, but agreed that this defect was curable by amendment.

[5] The Court of Appeal in an initial, vacated opinion determined that the Legislature delegated *exclusive* power to the Board over controversies arising from the enforcement of horseracing rules and regulations. In an amicus brief filed on rehearing, the Board indicated that, although unprecedented, it would award affirmative relief in appropriate cases in the future pursuant to the broad interpretation of its power set forth in the original vacated majority opinion. The Court of Appeal in its second opinion reiterated this interpretation of broad power.

fulfilled the requisite malicious intent for intentional interference with prospective economic advantage. In essence, therefore, the Court of Appeal found, through the conspiracy allegation, that a cause of action had been stated for intentional interference with prospective economic advantage, the underlying wrong.

The second ground upon which plaintiff challenges the Court of Appeal's ruling involves the jurisdiction of the Board. Plaintiff contends the court erred in holding that the Board has initial jurisdiction to award compensation to horse owners whose prospects for winning a cash prize are substantially harmed by another. Plaintiff further argues that the court erroneously applied the exhaustion of remedies doctrine. He contends that because the Board, for the first time in its amicus brief and at oral argument on rehearing, indicated a willingness to consider compensatory awards *in the future,* the Court of Appeal erroneously applied the exhaustion of remedies doctrine retroactively. Plaintiff asserts that he exhausted the *available* administrative remedies prior to seeking review in the courts, and that where no administrative remedy exists, a court action is proper.

Defendant responds that the complaint failed to state *any* valid tort cause of action for either negligent or intentional interference with prospective economic advantage, including a conspiracy to interfere. Defendant further asserts that the superior court lacked jurisdiction over this claim for two reasons: (1) the Board has exclusive jurisdiction over all matters relating to horseracing, and (2) plaintiff failed to exhaust his administrative remedies.

In addition, defendant also contends the *Board* has no power to award compensation to racehorse owners for *tort damages.* He argues the Legislature has expressed the intention that the Board's responsibility is limited to enforcement of the rules and regulations concerning horseracing as a business and a sport. As will appear, we agree with most of defendant's contentions.

## III. DISCUSSION

We conclude that the Court of Appeal reached the correct result in affirming the dismissal as to all three counts. However, in our view, such a result should be based on substantive, rather than procedural, grounds. The Court of Appeal affirmed the dismissal for failure to exhaust administrative remedies; we believe it erred in holding that the complaint stated a valid cause of action based on conspiracy (between competitors and noncompetitors) to interfere with plaintiff's prospective economic advantage. To the contrary, and despite the existence of any such conspiracy, we conclude

that tort liability for interference with prospective economic advantage is not available, as a matter of law and public policy, in the context of a sporting event.

A. *Interference With Prospective Economic Advantage—Legal Principles*

Each of the three counts in the complaint purports to state a claim for loss of prospective economic advantage, rather than for physical personal injury or property damage. The torts of negligent or intentional interference with prospective economic advantage require proof of various elements as a prerequisite to recovery. ■ However, as a matter of law, a threshold causation requirement exists for maintaining a cause of action for either tort, namely, proof that it is reasonably *probable* that the lost economic advantage would have been realized but for the defendant's interference.

■ ■ ■ ■ Over the past several decades, California courts analyzing the tort of interference with prospective economic advantage have required such a threshold determination. In *Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815 [122 Cal.Rptr. 745, 537 P.2d 865], where we set out the five elements of the *intentional* form of the tort, we stated that the first element requires "the *probability* of future economic benefit."[6] (*Id.,* at p. 827, italics added.) Although varying language has been used to express this threshold requirement, the cases generally agree it must be reasonably probable that the prospective economic advantage would have been realized but for defendant's interference. (See *Worldwide Commerce, Inc.* v. *Fruehauf Corp.* (1978) 84 Cal.App.3d 803, 811 [149 Cal.Rptr. 42] ("creditor-guarantor relationship was one reasonably expected to be economically advantageous"]; *Wilson* v. *Loew's Inc.* (1956) 142 Cal.App.2d 183, 190 [298 P.2d 152], cert. granted (1957) 352 U.S. 980 [1 L.Ed.2d 364, 77 S.Ct. 381], cert. dism. (1958) 355 U.S. 597 [2 L.Ed.2d 519, 78 S.Ct. 526] ["it must appear that such (prospective) contract or relationship would otherwise have been entered into"]; *Campbell* v. *Rayburn* (1954) 129 Cal.App.2d 232, 234 [276 P.2d 671] ["facts showing that the plaintiff had any reasonable expectation of economic advantage which would otherwise have accrued"].)

■ Notwithstanding this line of California authority requiring at least the reasonable probability of an expectancy to establish a cause of action

---

[6] The five elements for intentional interference with prospective economic advantage are: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant. (See *Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 827.) In the present case, the "relationship" required in the first element is arguably the potential relationship between plaintiff and the racetrack; the economic benefit is a richer "purse" that he would have received.

for interference with prospective economic advantage, the Court of Appeal here relied on a lone appellate case seemingly to the contrary. In *Gold* v. *Los Angeles Democratic League* (1975) 49 Cal.App.3d 365 [122 Cal.Rptr. 732], the court applied principles of intentional interference with prospective economic advantage to the factual setting of an election. We do not find that setting analogous to a horserace.

In *Gold,* the plaintiff, a candidate for Los Angeles City Controller, claimed that defendants had interfered with his opportunity to win an election to political office. The defendants, including several political supporters of plaintiff's opponent, had sent a false and misleading mailing to voters stating their candidate, and not plaintiff, was the candidate officially endorsed by the Democratic Party. The opponent was in fact not so endorsed; he was a Republican. Plaintiff alleged that his defeat by the voters was a result of defendants' misrepresentations. The trial court in *Gold* sustained defendants' demurrer, but the Court of Appeal majority held defendants' actions stated a cause of action for interference with prospective economic advantage; plaintiff's expectancy was the salary he would have earned had he won the election. Defendants failed to petition for hearing with this court.

The *Gold* court seemed to place little emphasis on the general tort requirement that the plaintiff show a probability of the prospective advantage, that is, that plaintiff would have benefited economically but for the interference. The Court of Appeal here noted that the *Gold* majority "was not concerned about what some might call the 'speculative nature' of plaintiff's injury. Actually plaintiff had lost the election by a four-to-one margin. . . . It seems *most unlikely* plaintiff would have won election and the economic advantage of serving in that office even if defendants had refrained from sending out this one misleading brochure. But this factor did not bother the California court. It upheld the cause of action for interfering with a contestant's opportunity to win a contest." (Italics added.)[7]

Based primarily on *Gold,* the Court of Appeal here extended interference with prospective economic advantage from political contests to sports contests on the basis that "there appears to be no reason to distinguish politics from sports . . . [and] no California case . . . limits *Gold* to political contests. Nor have we found any California cases which expressly exempt athletic contests from the tort." We conclude, however, that *Gold* is distinguishable because it dealt with interference with elections and with the

[7]The dissent in *Gold* concluded that the effect of defendants' pamphlet on Gold's chances of winning the election was too remote and speculative to justify judicial intervention. (*Id.,* at p. 380, fn. 5 [dis. opn.].)

public's right to accurate information regarding candidates. As the *Gold* court stated, the allegations of interference with prospective economic advantage "tend to show that, because of the misrepresentation, the election did not express the will of an undeceived, well-informed public. [Citation.]" (49 Cal.App.3d at p. 376.) We do not believe any sporting event rises to the same level of importance as a political election and the processes involved therein.

At oral argument, plaintiff relied on *Smith* v. *Superior Court* (1984) 151 Cal.App.3d 491 [198 Cal.Rptr. 829], a case citing *Gold* on the issue of interference with prospective economic advantage. *Smith* involved an action against an automobile dealer to recover for personal injuries due to a defective wheel. Prior to trial, the dealer either lost or destroyed certain automotive parts he had promised to maintain, and plaintiff's experts were thereby unable to inspect and test those parts to pinpoint the cause of the defect. The court observed that intentional destruction or spoliation of evidence had not been recognized as a tort, and utilized the elements set out in *Buckaloo, supra,* 14 Cal.3d at page 827, for intentional interference with prospective economic advantage to *analogize* to spoliation of evidence.

*Smith* analogized the opportunity to win an election in *Gold* to the opportunity to win the lawsuit, an expectancy plaintiff argues is no more speculative than the outcome of a sporting event. However, the *Smith* court noted that protecting the right to a civil action in a products liability case is the type of valuable "probable expectancy" the court must protect from the kind of interference alleged by plaintiffs there. (151 Cal.App.3d at p. 502.) *Smith* concluded that *public policy* dictates that an interest in prospective civil litigation is entitled to legal protection against alleged intentional spoliation of evidence even though damages could not be pleaded with complete certainty. (*Id.* at p. 503.)

The *Smith* court recognized that recovery for interference with an economic relationship depends upon the probability of future economic benefit to plaintiff. As *Smith* stated: "California courts have adopted Prosser's belief in the importance of 'probable expectancies' in several cases dealing with interference with prospective business advantage, requiring only an allegation of a 'reasonable probability' that a contract or profit would have been obtained but for the defendant's acts. (*Campbell* v. *Rayburn* (1954) 129 Cal.App.2d 232, 235 . . . ; *Brody* v. *Montalbano* (1978) 87 Cal.App.3d 725, 738 . . . ; see also *Gold* v. *Los Angeles Democratic League* (1978) 49 Cal.App.3d 365, 375. . . .)" (*Smith, supra,* 151 Cal.App.3d at p. 502.)

Next to *Gold, Smith* may represent the most speculative advantage that has heretofore been recognized by the California appellate courts. Just as

*Gold* protected the fundamental right to a fair election, *Smith* based its ruling on the importance of preserving the integrity of civil litigation. We do not believe that comparably important public policy considerations exist here. Indeed, as will appear, public policy dictates a rule that would preclude litigants from burdening the courts with controversies over sporting events which supposedly involved some economic loss.

Thus, we find that the Court of Appeal here erred in extending *Gold* to the factual setting of a sporting event. Unlike *Gold* and *Smith,* no compelling public policy exists which would justify ignoring the threshold requirement of reasonable probability of economic gain in the context of a sporting event.

## B. *Interference With Competitive Contests*

As indicated previously, the Court of Appeal failed to apply the threshold requirement of a probability of the prospective economic benefit. That requirement is especially appropriate to evaluate a lost economic expectancy where the facts involve a competitive contest of one kind or another. To require less of a showing would open the proverbial floodgates to a surge of litigation based on alleged missed opportunities to win various types of contests, despite the speculative outcome of many of them. In fact, it is the very "speculativeness" of the outcome that makes such competitions interesting. Further, to allow recovery without proof of probable loss would essentially eliminate the tort's element of causation, which links the wrongful act with the damages suffered.

Scholarly authority and cases from other jurisdictions agree that an application of the threshhold requirement of probable expectancy to the area of contests in general will usually result in a denial of recovery. Prosser has generally remarked that "since a large part of what is most valuable in modern life depends on 'probable expectancies,' as social and industrial life becomes more complex the courts must do more to discover, define and protect them from undue interference." (See Prosser & Keeton, Torts (5th ed. 1984) § 130, p. 1006, fn. omitted.) Prosser, however, has specifically addressed the area of interference with contests: "When the attempt has been made to carry liability for interference . . . into such areas as . . . *deprivation of the chance of winning a contest,* the courts have been disturbed by a feeling that they were embarking upon uncharted seas, and recovery has been denied; and *it is significant that the reason usually given is that there is no sufficient degree of certainty that the plaintiff ever would have received the anticipated benefits."* (*Ibid.,* italics added, fn. omitted.)

Notwithstanding rare cases where public policies are compelling, the tort of interference with prospective economic advantage traditionally has not

protected speculative expectancies such as the particular outcome of a contest. Prosser instructs that the true source of the modern law on interference with prospective relations is the principle that tort liability exists for interference with *existing* contractual relations. (Prosser & Keeton, *supra,* at p. 1006.) "For the most part the 'expectancies' thus protected have been those of future contractual relations . . . . In such cases there is a background of business experience on the basis of which it is *possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered.*" (*Ibid.,* italics added.)

Recently in *Blank* v. *Kirwan* (1985) 39 Cal.3d 311 [216 Cal.Rptr. 718, 703 P.2d 58], we acknowledged Prosser's suggestion that the interests generally protected by the tort are *business* expectancies, and on that basis we declined to expand the tort to cover interference with prospective nonbusiness relations. In *Blank,* an unsuccessful applicant for a license to operate a poker club brought an action against a city, public official and private individuals alleging a conspiracy to monopolize the operations of poker clubs. We ruled the complaint failed to state a cause of action for intentional interference with prospective economic advantage. Citing *Buckaloo, supra,* 14 Cal.3d at page 827, we held that plaintiff had failed to state adequate facts satisfying the first element of the tort, namely, an economic relationship between the plaintiff and some third person containing the *probability of future economic benefit* to the plaintiff. (*Id.,* at pp. 330-331.)

There were two reasons in *Blank* why plaintiff failed to state a cause of action. First, the requisite relationship with third persons involved as yet unknown or nonexistent patrons; the relationship between the defendant city and plaintiff could not be characterized as an economic one. "Second, even if the relationship between plaintiff and the city could be so characterized, it would make little difference. The tort has traditionally protected the expectancies involved in ordinary commercial dealings—not the 'expectancies,' whatever they may be, involved in the governmental licensing process. (See Prosser & Keeton, [*supra,* ] p. 1006.) Plaintiff does not attempt to justify such an expansion of the tort. Nor would he likely have been successful if he had." (39 Cal.3d at p. 330.) Thus, the plaintiff in *Blank* failed to show any real expectation of economic advantage because the city council's discretion to grant or deny applications for a poker club license was broad and negated any expectancy as a matter of law. (*Id.,* at pp. 330-331.)

Determining the probable expectancy of winning a *sporting* contest but for the defendant's interference seems impossible in most if not all cases, including the instant case. Sports generally involve the application of vari-

ous unique or unpredictable skills and techniques, together with instances of luck or chance occurring at different times during the event, any one of which factors can drastically change the event's outcome. In fact, certain intentional acts of interference by various potential "defendant" players may, through imposition of penalties or increased motivation, actually allow the "victim" player or team to prevail. Usually, it is impossible to predict the outcome of most sporting events without awaiting the actual conclusion.

The Restatement Second of Torts specifically addresses the speculative nature of the outcome of a horserace. The relevant comment is contained in a "Special Note on Liability for Interference With Other Prospective Benefits of a Noncontractual Nature." The comment states that various possible situations may justify liability for interference with prospective economic benefits of a noncommercial character. Special mention is given to "[c]ases in which the plaintiff is wrongfully deprived of the expectancy of winning a race or a contest, when he has had *a substantial certainty or at least a high probability of success.* For example, the plaintiff is entered in a contest for a large cash prize to be awarded to the person who, during a given time limit, obtains the largest number of subscriptions to a magazine. At a time when the contest has one week more to run and the plaintiff is leading all other competitors by a margin of two to one, the defendant unjustifiably strikes the plaintiff out of the contest and rules him ineligible. In such a case there may be sufficient certainty established so that the plaintiff may successfully maintain an action for loss of the prospective benefits. *On the other hand, if the plaintiff has a horse entered in a race and the defendant wrongfully prevents him from running, there may well not be sufficient certainty to entitle the plaintiff to recover.* . . . " (Rest.2d Torts, § 774B, special note, pp. 59-60, italics added.)

As indicated by the Restatement comment, certain contests may have a higher probability of ultimate success than others. To this end, the cases cited by the Court of Appeal here, awarding damages to competitors in contests, are distinguishable because in each case there was a high probability of winning.[8] In addition to the Restatement position, one older case has specifically held that the loss of a chance to win a prize purse at a

---

[8] Nor are we persuaded by the Court of Appeal's argument that damages should be allowed for the value of the lost chance of benefit. (See Schaefer, *Uncertainty and the Law of Damages* (1978) 19 Wm. & Mary L.Rev. 719.) Under this approach, plaintiff would not recover the full value of the lost prize but that value discounted by the probability of winning in the absence of defendant's interference. We believe this calculation is incorporated in the basic analysis for interference with prospective economic advantage; the speculative nature of the chance of winning is examined in establishing the first element of the tort as opposed to determining specific damages after recognizing a cause of action. In the instant case, the potential economic advantage is simply too speculative to allow *any recovery.*

trotting horserace was too speculative to support tort liability. (See *Western Union Tel. Co.* v. *Crall* (1888) 39 Kan. 580 [18 P. 719].)

Applying the foregoing analysis to the instant case, it seems clear that plaintiff's complaint fails adequately to allege facts showing interference with a *probable* economic gain, i.e., that Bat Champ would have won this horserace, or at least won a larger prize, if defendant had not interfered. Here, the complaint only alleged in conclusory terms that defendant's wrongful interference resulted in a lost "opportunity" to finish higher in the money. The complaint merely indicated that defendant's maneuvers and whipping forced Bat Champ to break stride and fall out of contention.[9]

We conclude, as a matter of law, that the threshold element of probability for interference with prospective economic advantage was not met by the facts alleged, whether or not some "conspiracy" between a competitor and noncompetitor existed. It was not reasonably *probable,* on the facts alleged, that Bat Champ would have finished in a better position. Indeed, we may take judicial notice of the impossibility of predicting such matters; the winner of a horserace is not always the leader throughout the race for a horse can "break the pack" at any point in the race, even as a matter of strategy. Further, many races are won by a "nose." Thus, no cause of action exists for interference with this horseracing event.[10]

## C. *Sporting Contests—Public Policy Considerations*

Courts must be guided by considerations of common sense, justice and fair play when making public policy determinations. ██ In setting forth special criteria for negligent interference with prospective economic advantage in *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 804, footnote 1 [157 Cal.Rptr. 407, 598 P.2d 60], we stated: "Countervailing public policies may preclude recovery for injury to prospective economic advantage in some cases, such as the strong public policy favoring organized activity by

---

[9]Presented in plaintiff's opposition to the demurrer were the following additional facts: "As the horses entered in the eighth race rounded the last turn, Bat Champ *began to make his move* to the lead of the group. As his move progressed, Defendant drove his horse into Bat Champ's path and thereafter whipped Bat Champ with his whip. Bat Champ's advance was halted, his stride broken and his *chances* at finishing 'in the money' ended." (Italics added.) Further, at oral argument, plaintiff asserted that the alleged interference took place 100 yards from the finish line. However, despite these asserted facts, Bat Champ's chance of placing higher in the purse money remained highly speculative.

[10]At oral argument, plaintiff requested leave to amend his complaint. However, in light of the speculative nature of the outcome of a horserace, and our additional conclusion discussed below, that no recovery should be available for economic loss occasioned as a result of interference during any sporting event, the trial court properly sustained the demurrer without leave to amend. (See *Routh* v. *Quinn* (1942) 20 Cal.2d 488. 493-494 [127 P.2d 1].)

workers. Accordingly, interference with the prospective economic advantage of an employer or business has traditionally not been considered tortious when it results from union activity, including picketing, striking, primary and secondary boycotts or similar activity, that is otherwise lawful and reasonably related to labor conditions. [Citations.]"

Similar policy considerations apply here. The courts are not appropriate forums for adjudicating claimed sporting event violations which allegedly resulted in prospective economic loss. Although the economic rewards for engaging in professional sports have grown over the past decades, a sporting event is still a *contest.* The atmosphere of competition remains predominant despite the potential economic rewards. The regulation of sports conduct heretofore has been delegated to supervising regulatory agencies for each particular sport. Specific rules and regulations exist to provide for penalties for violations; remedies are seldom economic but usually involve sanctioning, within the context of the competition, the violating competitors. Our crowded courts are ill-equipped to decide such specialized matters.

The regulatory method for sanctioning or penalizing sports violators has proven relatively successful and is generally accepted. In the instant case, numerous administrative remedies are available through the Board to punish drivers who intentionally or recklessly drive their horses. It seems unnecessary to supplant this system by bringing the owners or harness drivers into the courtroom for a determination of speculative compensatory economic damages. It is the competitive nature of sporting in general, including both strategy and luck, that makes a claim for a "lost purse" markedly different from a claim for personal injuries.[11]

If the tort of interference were recognized in the context of a sporting competition, virtually no such event would take place without a tort claim from some losing competitor seeking to recover his supposed *economic* loss; a player's every move would be highly scrutinized for possible use in the courtroom. Placing this type of additional pressure on competitors could seriously harm competitive sports.

In the specific context of a horseracing event, the physical demands placed on harness drivers attempting to control and maneuver the animals frequently may require jockeying for position. Imprecision is inherent in the maneuvering of these animals and it is impossible to assure that physical contact among the horses will not occur. In fact, the harness racing rules

---

[11] We emphasize, as did the Court of Appeal, that this holding applies only to claims for prospective *economic* loss.

contain provisions that address the nature of the contact which is likely to occur, indicating an awareness of the constant maneuvering required in the sport.[12] To impose liability on drivers for acts which may be a necessary consequence of their jockeying for track position would effectively eliminate the type of intense competition permitted by the rules of racing. We should not sanction moving the arena for sporting competitions from the stadium, boxing ring or horseracing track into the courtroom. In light of these important public policies, we conclude that a cause of action will not lie for prospective economic loss which arises between competitors during a sporting contest.[13]

The issue of whether a *conspiracy* to interfere may give rise to the tort of intentional interference with prospective economic advantage was raised in the Court of Appeal. It concluded that only the conspiracy count stated a valid cause of action for the tort of intentional interference with prospective economic advantage. The court determined that the *act of conspiring* to interfere represents the type of improper motive or means necessary to constitute the tort of intentional interference with prospective economic advantage. According to the court, no such ill-motive can be found in the sort of intentional acts which are naturally a part of athletic competition. But a plot by the driver and others to cause Bat Champ to lose the race both offends public policy and discloses the requisite improper intent to sustain tort recovery. Therefore, the court concluded the conspiracy count satisfies the elements of intentional interference with prospective economic advantage.

The Court of Appeal correctly stated that there is no separate tort of civil conspiracy. Rather the conspirators must agree to do some act which is classified as a "civil wrong." (*Unruh* v. *Truck Insurance Exchange* (1972) 7 Cal.3d 616, 631 [102 Cal.Rptr. 815, 498 P.2d 1063].) But we fail to see why the act of competitors conspiring with others (e.g., teammates, friends, coaches, other competitors) to commit an intentional improper play in a sporting competition is so different in kind from the commission of that act by a competitor acting on his own. It would become impossible to draw a distinction between behavior that is sufficient to justify liability, i.e., a conspiracy, and behavior that is excusable as being committed in the heat of competition, i.e., fair play. Further, the fact that a

---

[12] See California Administrative Code, title 4, sections 1720-1736. We note that these sections are specific to harness racing but apply in addition to the other sections of the chapter regulating horseracing in general. (*Id.,* § 1720.)

[13] The facts do not present and we do not reach the question of whether liability could be imposed in a case charging wrongful interference *solely by a noncompetitor* (such as a fan, gambler or other person financially interested in the outcome), at least where the threshold element of *probable* loss is met.

conspiracy exists does not affect the lack of any reasonable probability that economic gain would have been realized. We therefore conclude that even conspiracies formed between competitors, or between competitors and non-competitors, do not justify liability for intentional interference with prospective economic advantage in the sports context.[14]

### D. *Jurisdiction of the Board*

The Court of Appeal herein held the Board has jurisdiction to decide and enforce tort claims against licensees and nonlicensees of the Board who unlawfully interfere, or cause others to unlawfully interfere, with a horserace. This determination was based primarily on language in the Business and Professions Code and the California Administrative Code establishing the Board's authority over horseracing.

The present case involved a unique procedural sequence of events. As previously stated, at the time the trial court sustained defendant's demurrer, the Board followed a policy of refusing to award tort compensation. However, the Board later indicated a willingness to do so, based on the Court of Appeal's conclusion that the Board's authority included "the power to award compensation to horseowners who are victimized by unlawful conduct during horse race meetings." The court ultimately determined that a new administrative remedy was available to plaintiff which was previously unavailable. Thus, the court directed the Board to waive time limits so that plaintiff could bring his claim to the Board for affirmative relief.

Contrary to the Court of Appeal's conclusion, the power to award compensatory and punitive tort damages to an injured party is a judicial function. Although the Board has very broad power to regulate and discipline wrongful conduct which involves horseracing in California, the relevant statutes do not authorize awarding *affirmative* compensatory relief such as tort damages.

The Court of Appeal concluded that three enactments essentially vested the Board with power to award tort recovery for economic loss. First, Business and Professions Code section 19440 provides in part: "The board

---

[14] At oral argument, counsel for plaintiff further clarified the conspiracy cause of action. He asserted that a conspiracy for interference with prospective economic advantage should lie (in the context of a horserace) when there is a conspiracy to eliminate a horse *for motives other than to further the position of the offending horse.* In the present case, plaintiff asserts the conspiracy was for the purpose of "fixing" the race, a motive that should give rise to a cause of action. Although plaintiff did not make a specific allegation of "race fixing" in the complaint, he requests the opportunity to amend. However, in light of our conclusion foreclosing tort liability for economic loss occasioned during a sporting event, such a distinction between motives is unnecessary.

shall have all powers necessary and proper to enable it to carry out fully and effectually the purposes of this chapter. . . ." Second, the California Administrative Code, title 4, section 1530, provides: "Should any case occur which may not be covered by the Rules and Regulations of the Board or by other accepted rules of racing, it shall be determined by the stewards in conformity with justice and in the interest of racing." Third, section 1529 of the Administrative Code provides: "The stewards may refer any matter within their jurisdiction to the Board when the penalty the stewards have jurisdiction to impose is insufficient . . . or for other good and sufficient cause, and they may order the suspension of the licensee pending further Order of the Board. In such event, the Board shall accept the matter for hearing and adjudication or such other action as the Board deems to be in the best interests of justice."

Although the provisions cited by the Court of Appeal vest the Board with broad powers, such powers are *regulatory* in nature. The Board was created by legislative enactment in 1933 and the grant of broad power has remained essentially unchanged since that time. The preamble to the act provided that its purpose, however, was to regulate, license, supervise and "provide *penalties* for the violation of the provisions of this act." (Stats. 1933, ch. 769, p. 2046, italics added.) Further, in *Flores* v. *Los Angeles Turf Club* (1961) 55 Cal.2d 736, 745-746 [13 Cal.Rptr. 201, 361 P.2d 921], we described the Board's powers by noting that "pursuant to article IV, section 25a of the California Constitution, the Legislature has enacted a comprehensive scheme of legislation designed to *regulate almost every aspect of legalized horse racing and wagering.*" (Italics added, fn. omitted.)

Business and Professions Code section 19440 confirms this broad *regulatory* power of the Board. In part the code provides: "Responsibilities of the board shall include, but not be limited to: . . .[¶] (2) Administration and enforcement of all laws, rules and regulations affecting horseracing and parimutuel wagering. [¶] (3) Adjudication of controversies arising from the enforcement of those laws and regulations dealing with horseracing and parimutuel wagering. . . . [¶] The board may delegate to stewards such of its powers and duties that are necessary to carry out fully and effectuate the purposes of this chapter." (Bus. & Prof. Code, § 19440.)

Pursuant to this delegation of power, the Board has promulgated rules contained in California Administrative Code, title 4, section 1400 et seq. Nowhere in title 4, however, is the Board given authority to award affirmative relief in the form of compensatory or punitive tort damages. Section 1405 of title 4, contained in article 1 (Racing Board Powers and Jurisdiction), provides for punishment by the Board: "Violation of any provision of this chapter . . . is punishable in the discretion of the Board by

revocation or *suspension of any license, by fine, or by exclusion* from all racing . . . or by any combination of these *penalties.* The Board may independently *punish* any misconduct of any person connected with racing." (Italics added.)

The stewards, with whom a claim of interference may be lodged after a race, also have limited authority. Section 1528 of title 4 of the California Administrative Code provides in part: "The stewards may *suspend the license* of anyone whom they have the authority to supervise or they may *impose a fine* or they may exclude from all enclosures in this State or they may *suspend, exclude and fine.*" (Italics added.) The Court of Appeal herein acknowledged that the "stewards are given express authority to *punish* a jockey or horse owner or anyone else who is licensed by the Board and is found to have violated a riding rule." (Italics added.)

These specific rules and regulations in the California Administrative Code demonstrate the character of the Board as a regulatory and disciplinary entity. The extensive regulations neither express nor imply any authority to award affirmative monetary relief. In fact, each section which authorizes adjudication of racing violations reveals the power of the Board is limited to fines, penalties or exclusions. Accordingly, the regulatory relief available from the Board indicates that it lacks the power to award damages to those who are injured by a violation of the Horse Racing Law (Bus. & Prof. Code, § 19400 et seq.). It is undisputed that the Board has never awarded such affirmative relief and that neither the Horse Racing Law nor the Board regulations specifically include "damages" as a form of relief afforded by the Board.[15]

Further, California Administrative Code, title 4, section 1699, subdivision (c), provides a *specific penalty* for acts of interference such as are alleged herein: "A horse which interferes with another and thereby causes any other horse to lose stride, lose ground, or lose position, when such other horse is not in fault and when such interference occurs in a part of the race where the horse so interfered with loses the opportunity to place where he might, in the opinion of the stewards, be reasonably expected to finish, may be *disqualified and placed behind the horse so interfered with.*" (Italics added.) Therefore, since neither the statutes nor the administrative rules governing the power of the Board grant authority to award affirmative relief, we conclude that the jurisdiction of the Board is confined to disciplin-

---

[15]We do not mean to imply that the Board is without authority to require compensatory relief as a condition for reinstatement of licenses. We agree with Justice Grodin that "the Board's power to afford that remedy is not presented here." (*Post,* p. 85.) All we now hold is that the Board may not award general tort damages.

ary and regulatory matters. [16] Accordingly, the only remedy available from the Board in this case is to reorder the finishing positions of the competitors, which has already been done. (Cal. Admin. Code, tit. 4, § 1699, subd. (c).)

## IV. CONCLUSION

Deprivation of the *chance* of winning a horserace or any sporting event does not present a basis for tort liability for interference with prospective economic advantage. Here, the probability that plaintiff's horse would have won the race is simply too speculative a basis for tort liability. Further, as a matter of public policy, no such tort cause of action is available in the context of any sporting event. Finally, the Horse Racing Board lacks jurisdiction to award general tort damages.

The judgment of the Court of Appeal is affirmed.

Mosk, J., Broussard, J., and Panelli, J., concurred.

**REYNOSO, J.**—I concur, but on a limited basis. The majority correctly hold that tort liability for potential economic loss as a result of illegal conduct which occurs during a sporting event is prohibited on the basis of public policy. No more need be said.

We deal with a very narrow factual situation, a sporting event. Many older cases, mentioned in the majority, dealing with the tort of interference with prospective economic advantage turn almost entirely upon the defendant's motive or purpose, and the means by which it will be accomplished. Such an approach was used primarily to emphasize that the tort was not applicable in the context of bona fide competition. (4 Witkin, Summary of Cal. Law (4th ed. 1974) § 392, p. 2643.) In sporting events, where the line between bona fide competition and unfair competition is so finely drawn as to require regulation by specific agencies or organizations, the courts should not interfere.

The emphasis on improper conduct which we find in those older cases does not lessen or diminish plaintiff's burden to establish, as a threshold

---

[16] The Court of Appeal opinion would have conferred a broad grant of power to the Board. In a footnote, the court stated that although the Board itself, rather than the stewards, preferably should adjudicate tort claims for compensation, it would leave these administrative and procedural matters to the judgment of the Board. The ultimate result of such a decision cannot be sanctioned, for stewards should not sit as judges in civil law tort actions. The fact that the Board has indicated in essence that it would be willing to award affirmative relief does not change our conclusion; unless there is a valid legislative grant of power, the Board cannot award such relief.

requirement, probable economic gain. The lack of any reasonable probability that gain would have been realized defeats the cause. Thus, it is not enough to conclude, as did the Court of Appeal, that the acts of two or more persons to achieve illegal goals comprise the type of improper conduct that is actionable.

Defendant's other contentions need not be reached: (1) that the superior court lacked jurisdiction to consider plaintiff's claim, or (2) whether the California Horse Racing Board has the exclusive power to consider claims for compensatory relief. The Court of Appeal found it necessary to reach the latter issue because it concluded that a cause of action had been stated. However, plaintiff never sought compensatory relief from the board; and since we have decided that no cause of action has been stated, there is no reason for this court to reach that question.

Bird, C. J., concurred.

GRODIN, J.—Like Justice Reynoso, I concur in the judgment, but would rest the decision on even narrower grounds than suggested in his concurring opinion. In my view, it is inappropriate in this case to permit plaintiff to maintain a tort cause of action for intentional interference with prospective economic advantage because of the broad authority which the Legislature has granted to the California Horse Racing Board to regulate, and to devise remedies for, misconduct by participants within the horse racing industry. (Bus. & Prof. Code, § 19440.) In the absence of such legislation, I am not convinced that it would necessarily be appropriate to bar tort recovery simply because defendant's intentional misconduct occurred during the course of a sporting event.

Although in the sporting context there certainly will be some instances in which the relationship between the defendant's intentional misconduct and damages would be too speculative to support recovery under ordinary tort principles, it is not difficult to imagine other instances—e.g., a horse shot just before it crosses the finish line, 10 lengths ahead of the field—in which the causal relationship will be no more speculative than in many other financial settings in which tort recovery is routinely permitted. If tort recovery is properly to be barred in such circumstances, it would have to be for reasons other than the "speculativeness" of the injury.

The majority suggests that, apart from the "speculative nature" of the damages, tort recovery should be barred in the field of sports as a matter of "public policy." In the absence of any legislative declaration of such a public policy, however, I have difficulty understanding the source from which the majority draws this policy. The majority points to nothing in the

current fabric of laws or regulations which suggests that the public interest demands that professional gamblers or others who may have much to gain by "fixing" the results of sporting events should generally be permitted to engage in intentional misconduct with impunity from ordinary principles of civil liability. Under the circumstances, I see no reason for the court to go out of its way to grant broad immunity to such intentional misconduct, particularly when such a rule is unnecessary to the decision in this case.

Finally, I also, again like Justice Reynoso, would withhold any decision on the question whether the Horse Racing Board has the statutory authority to provide compensatory relief to a person who has been injured through an intentional violation of one of the board's regulations, by, for example, conditioning the reinstatement of a wrongdoer's license on his payment of wrongfully obtained gains to the victim. Because plaintiff never sought such relief from the board, the question of the board's power to afford that remedy is not presented here.