SESSIONS TANK LINERS, INC., d/b/a Southwest Tank Liners, Inc., Plaintiff,

v.

JOOR MANUFACTURING, INC., SCM Corporation d/b/a Glidden Coatings and Resins, and Does 1 through 10 inclusive, Defendants.

No. CV 84–6363 MRP.

United States District Court, C.D. California.

Dec. 11, 1991.

Blecher & Collins, Maxwell M. Blecher, Donald C. Hsu, Donald R. Pepperman, Los Angeles, Cal., for plaintiff.

Farella Braun & Martel, Jerome I. Braun, George H. Kalikman, San Francisco, Cal., Lorenz Alhadeff Lundin & Oggel, Robert D. Rose, San Diego, Cal., for defendants.

## OPINION

PFAELZER, District Judge.

In 1981, the Western Fire Chiefs Association ("WFCA") adopted a Uniform Fire Code ("UFC") provision which in effect banned tank lining. The adoption of the provision and the events leading to its adoption adversely affected the business of plaintiff Sessions Tank Liners, Inc. ("Sessions"). In this action, Sessions charges the defendant Joor Manufacturing, Inc. ("Joor") with a violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1988), on account of Joor's role in these events and the adoption of the model fire code provision. Sessions claims, in addition, that Joor intentionally interfered with its prospective economic advantage.

This case is before the Court on remand from the Ninth Circuit, *Sessions Tank Liners, Inc. v. Joor Manufacturing, Inc.*, 852 F.2d 484, 485 (9th Cir.1988) ("*Sessions III*"), to determine whether Joor's efforts

to influence the WFCA's code-promulgating process are immune from antitrust liability under the doctrine established by the Court in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) ("*Noerr*"), *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) ("*Pennington*"), and *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), as interpreted by the Supreme Court in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988) ("*Allied*"), and if not, whether Joor is liable under § 1.

The Court, having conducted a bench trial, concludes that (1) the defendant's actions are not shielded from antitrust liability by the *Noerr–Pennington* doctrine, (2) the defendant violated § 1 of the Sherman Act, 15 U.S.C. § 1, and (3) the defendant interfered with plaintiff's prospective economic advantage.

## FACTS

Joor manufactures and sells tanks for the underground storage of hazardous fluids such as gasoline. Sessions, also known as Southwest Tank Liners, Inc., repairs leaking storage tanks by cutting an opening in them, lining the interior with a protective coating of epoxy, and resealing them.[1] This method of repair does not require that the tank be removed from the ground.

Sessions and Joor compete in the marketplace for customers, such as service station owners, who own a leaking tank but require an impermeable one. While the cost of lining an old tank is roughly equivalent to the cost of purchasing a new one, customers often prefer to line their tanks because tank replacement involves the addi-tional cost of the labor necessary to remove and discard the old tank and to install the new one. Moreover, tank replacement often requires a lengthy interruption of business.

In August 1981, the WFCA—a private, non-profit, standard-setting association whose voting membership is limited to public fire officials—adopted its 1982 version of the UFC. The 1982 UFC included a provision, § 79.601(d), which required that leaking tanks either be removed from the ground or abandoned. Although the provision did not have the force of law, the UFC is a highly influential code. Many local governments in California and in other western states ultimately adopted the UFC; and, in localities within these states where the UFC was not enacted as law, public fire officials frequently enforced the Code's provisions on their own, refusing to issue permits for the underground lining of leaking tanks.[2] Joor's president and owner, Howard Robbins ("Robbins"), was a member of the WFCA subcommittee which drafted UFC § 79.601(d).

In the period of time relevant here, the WFCA enacted UFC provisions such as § 79.601(d) through a three-tiered process. First, subcommittees were established to examine fire-related issues and to draft proposed code provisions based on their findings.[3] These subcommittees were generally made up of public fire officials, private industry representatives, and members of other standard-setting organizations, all of whom had the right to vote on subcommittee matters. After a subcommittee completed its work, its proposals were published in two trade journals. The suggested revisions were then reviewed by the Uniform Fire Code Committee—a committee of public fire officials—at its annual meeting. The UFC Committee did not

---

**1.** Sessions, which lined tanks in California and in other western states, is one of approximately 30 licensed applicators of Glass Armor epoxy in the United States. Glass Armor is produced by the Bridgeport Chemical Company, located in Florida.

**2.** Both parties agree that at some point, a number of local governments adopted the UFC as law. Neither party, however, presented evidence of any specific governmental adoption of the code. The plaintiff did present evidence that public fire officials in designated areas routinely enforced the UFC ban on the lining of leaking tanks by denying permits to plaintiff.

**3.** Individuals could also propose code changes.

carefully review each proposed amendment, but gave consideration only to those which were the subject of an objection at the annual meeting by a member of the subcommittee which drafted the change.[4] Absent an objection to a proposal, the UFC Committee voted to recommend it for approval to the WFCA. After the UFC Committee meeting, proposed code changes were published in trade journals with the recommendations of the UFC Committee attached. The full body of the WFCA then voted on the proposed revisions at its annual meeting. Given the number of proposed changes, the length of those changes, and the brevity of the WFCA meeting, it was not contemplated that the WFCA would reexamine every proposal for revision. Like the UFC Committee, the WFCA generally adopted subcommittee revisions unless an objection arose at the WFCA meeting.[5] If a majority of the WFCA approved a proposed change, the change became part of the UFC. The WFCA revised its code every three years.

In December 1979, Joor's president Robbins volunteered to work on the subcommittee of the UFC Committee charged with revision of Article 79 of the UFC ("Article 79 subcommittee"), and began to attend its meetings. This subcommittee's assignment was to rewrite the 1979 version of Article 79, which established guidelines for the storage and handling of flammable liquids. The purpose of the revision was to make Article 79 consistent with rules established by the National Fire Protection Association ("NFPA"), another private standard-setting organization. The UFC delegated the task of rewriting Article 79 to the subcommittee because the fire officials in the UFC Committee and the WFCA had neither the time nor the technical expertise to draft and revise this section themselves. The subcommittee, in turn, directed Robbins to integrate UFC and NFPA provisions which related specifically to the depth and location of underground storage tanks. Neither the 1979 UFC nor the NFPA rules addressed tank lining or required the removal of leaking tanks from the ground.

The subject of tank lining did not arise in the Article 79 subcommittee until the afternoon of its final meeting on March 17, 1981. There are no agendas, minutes or drafts of revisions prior to March 17, 1981 which refer to tank lining or indicate that tank lining was a subject under consideration or discussion. Moreover, at trial, no study of tank lining was ever produced or referred to as having been the subject of discussion by the Article 79 subcommittee at any time. Although individual members of the subcommittee testified that they talked about tank lining among themselves or with other fire officials outside of the subcommittee, the subcommittee as a body addressed tank lining only on this one occasion. At this March meeting, representatives of Sessions and of Bridgeport Chemical Company were scheduled to deliver a presentation on the tank lining process.[6] However, the agenda for the meeting, dispatched to subcommittee members in advance, did not indicate that the subcommittee would either consider or vote on any code provision concerning tank lining.

In anticipation of the meeting, and in response to materials which Sessions distributed to the subcommittee, Robbins drafted a letter which was circulated to subcommittee members. Robbins had not been assigned by the subcommittee to address the subject of tank lining or to write this letter. In the letter, Robbins questioned the safety of the lining process and warned that the WFCA could be subject to liability for authorizing use of the process. Robbins did not deny that tank lining could prevent leaking. However, he argued that

---

4. However, the UFC Committee meetings were open to the public; and, in theory, any person could object to a proposed code change.

5. This meeting, like the UFC Committee meeting, was open to the public. While members of the public could not vote on UFC changes, they could express support for or opposition to any proposal under consideration.

6. Sessions officials had requested an opportunity to speak before the subcommittee after learning that Robbins, who they knew was a competitor opposed to tank lining, was a member of the subcommittee.

where there was leakage, there was weakened metal, and lining could not restore the structural integrity of a weakened tank. Even though it is an easily demonstrable fact that leaking tanks do not necessarily involve weakened metal, Robbins made this argument to cause the members of the subcommittee to believe that tanks that had been lined were in danger of structural collapse. Robbins did not reveal that relatively simple tests were available to measure the structural strength of a leaking tank in the ground in order to determine if it required replacement rather than repair. Representatives of Sessions were not provided with a copy of the Robbins' letter prior to their presentation to the subcommittee.

On March 17, 1981, the tank lining proponents made a brief presentation to the Article 79 subcommittee, answered questions, and left the subcommittee meeting. Not having seen Robbins' letter, the proponents were not in a position to effectively refute his arguments. After their departure, Robbins vigorously advocated a UFC ban on tank lining, repeating the concerns he had expressed in his letter about the safety of the lining process. In addition, Robbins advised the subcommittee falsely that lining a tank would "void" the tank's Underwriters Laboratories ("UL") label and, in turn, subject the WFCA to liability.[7] At the time he made these statements to the subcommittee, Mr. Robbins knew that the UL certification attests to the product's safety at the time the tank leaves the factory, and nothing done to the tank thereafter has the effect of negating the certification.

Although the other subcommittee members were well aware of Robbins' economic interest in banning the underground lining of leaking tanks, they did not object to, counter or question Robbins' arguments. Rather, they testified that they considered Robbins, who had an engineering background, to be the technical expert of the group. Accordingly, they relied on what he told them about tank lining and did not feel the need to go further.

Approximately one hour after the subject of tank lining was first raised in the subcommittee, Robbins made a motion to include in the revised Article 79 the provision which required the removal of leaking tanks from the ground. Robbins' motion passed unanimously. The minutes of the meeting reflect that the subcommittee's vote was predicated in part on Robbins' misrepresentation concerning the UL label.[8] The motion to prohibit the lining of leaking tanks passed as the last order of business of the Article 79 subcommittee.[9] Revised Article 79, the one-hundred page final work of the subcommittee, was then sent to the UFC Committee for consideration.

Because the fire officials on the UFC Committee and in the WFCA did not have the technical expertise to question the Article 79 subcommittee's proposals, review of these proposals was, as expected, perfunctory. In April 1981, the UFC Committee approved § 79.601(d) as drafted by the subcommittee. In fact, the UFC Committee made only a few changes to the whole of Article 79; and these changes were all made at the request of the Article 79 subcommittee members. The minutes of the UFC Committee meeting do not reflect any discussion on the subject of tank lining.[10]

7. A UL label indicates that a product has been certified as safe by the Underwriters Laboratories testing program. The label certifies the safety of the product only when the product is new. At the time Robbins made his misrepresentation concerning the "voiding" of this label, the UL representative on the Article 79 subcommittee was not present.

8. The minutes of the March 18, 1981 meeting read:
The committee was unanimous in their disapproval of cutting an opening in a tank and thus destroying the integrity of the UL ap-

proval to proceed with the lining process. Other problems of external corrosion, loss of structural stability, corrosion of piping, etc., were discussed and it was agreed that such lining procedures should be prohibited unless the finished product will meet UL approval. Exhibit 28.

9. The proposed code change provided: "Leaking tanks shall be removed from the ground."

10. The minutes indicate that Sessions' officials and Robbins were present at this meeting.

In August 1981, the WFCA followed suit.[11]

After the approval of UFC § 79.601(d) by the Article 79 subcommittee, but before adoption of it by the WFCA, Robbins sent letters to public entities, fire officials and other standard-setting organizations, as well as customer groups, advising them of the subcommittee's action. Fire officials in many jurisdictions, in turn, denied permits to Sessions in anticipation of the WFCA's final action. In that period, Sessions' business suffered a sharp decline. After the WFCA officially enacted the UFC, Sessions' business continued to suffer. While Sessions' business had been growing in the period 1973–1981, the business slumped in ensuing years.

In 1982 and 1983, the State of California enacted legislation which in effect approved and authorized tank lining, subject

to certain conditions.[12] Nevertheless, Sessions' business did not recover.

## PROCEDURAL HISTORY

Sessions filed this action on August 24, 1984, initially charging that Joor violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, as well as state law.[13] In 1986, the Court granted partial summary judgment for Joor on the ground that the *Noerr–Pennington* doctrine shielded Joor's actions from antitrust scrutiny. Memorandum of Decision and Order Granting Summary Judgment of January 17, 1986, as modified by Order of April 7, 1986.[14] The Court certified its decision to the Ninth Circuit for interlocutory review. Order of June 6, 1986.

The Ninth Circuit, finding that *Noerr* protected the defendant's attempts to lobby the WFCA, affirmed as to most of the allegations in the complaint.[15] *Sessions*

---

**11.** In adopting the Article 79 subcommittee's recommendation, the WFCA altered the language but not the substance of § 79.601(d). The 1982 code provision read: "Leaking tanks shall be promptly emptied and removed from the ground or abandoned in accordance with Section 79.113." Exhibit 137.

The WFCA did not keep minutes of its annual meeting.

**12.** The Boatwright Act, effective on January 1, 1983, provided in relevant part that no local agency could deny a permit to repair an underground storage tank "solely on the basis that the tank is to be repaired by an interior-coating process." Cal.Gov't Code § 53076 (West 1983).

The Sher Bill guaranteed the right of a tank-owner to repair a leaking underground tank once "by an interior-coating process" under certain conditions. Cal.Health & Safety Code § 25284.5 (West 1983). In addition, the Sher Bill provided that the legislature intended to "preempt any local regulations of underground storage tanks." Cal.Health & Safety Code § 25288.1 (West 1983). The Sher Bill has since been amended, but the law continues to express the legislative intent to preempt local regulation.

**13.** Plaintiff's complaint included claims for violations of the California Cartwright Act, unfair competition, tortious interference with contractual relations, tortious interference with prospective advantage, trade libel, and defamation. Defendant Joor alleged counterclaims for violations of the Lanham Act and intentional interference with contractual relations. Before trial, plaintiff abandoned its claim under Section 2 of the Sherman Act and its state law claims for defamation, unfair competition, and trade libel.

Defendant abandoned its counterclaims. Pretrial Order of November 13, 1989. The complaint initially named a second defendant. Sessions voluntarily dismissed this defendant in March 1985.

**14.** The Court initially granted summary judgment for defendant as to all of plaintiff's antitrust claims, and dismissed without prejudice plaintiff's state law claims. Order of January 17, 1986. The Court, however, subsequently reinstated plaintiff's complaint to the extent that it alleged "refusal to deal" claims as the *Noerr* doctrine did not apply to such claims. Order of April 9, 1986. The Court also reinstated plaintiff's state law claims at that time. *Id.* In modifying its initial order, the Court did not alter its determination that the *Noerr* doctrine entitled defendant to summary judgment as to those antitrust claims relating to defendant's conduct in connection with the WFCA.

**15.** The Ninth Circuit, however, concluded that Joor's alleged misrepresentations to fire officials *"outside"* of the WFCA lobbying process, *before* the Code was amended" may have fallen within the "sham exception" to *Noerr* and accordingly remanded on this limited issue. *Sessions I*, 827 F.2d at 468–69.

While the *Noerr–Pennington* issue was pending before the Ninth Circuit, this Court granted summary judgment for the defendant as to the refusal to deal claims, *see* Note 14, *supra*, and again dismissed without prejudice the pendent state law claims. Order of March 23, 1987. Plaintiff appealed this ruling.

The Ninth Circuit declined to address the merits of this second appeal, remanding to this

*Tank Liners, Inc. v. Joor Mfg., Inc.,* 827 F.2d 458 (9th Cir.1987) (*"Sessions I"*). The United States Supreme Court, however, vacated the Ninth Circuit's decision and remanded to the Ninth Circuit for further consideration in light of *Allied. Sessions Tank Liners, Inc. v. Joor Mfg., Inc.,* 487 U.S. 1213, 108 S.Ct. 2862, 101 L.Ed.2d 899 (1988). The Ninth Circuit, in turn, remanded to this Court. *Sessions III,* 852 F.2d at 485.

This Court conducted a bench trial to resolve the factual questions concerning Joor's role in the events leading to the adoption of the code provision.[16] After trial, the Court determined the issues, in particular those of credibility, against Joor, and found for Sessions on the § 1 claim, as well as the claim for intentional interference with prospective advantage.[17]

## DISCUSSION

### I. *Claim Under § 1 of the Sherman Act*

#### A. Noerr–Pennington Immunity

■ Joor contends that, under the *Noerr–Pennington* doctrine, it is immune from antitrust liability for urging the WFCA to adopt UFC § 79.601(d). This doctrine shields from antitrust scrutiny concerted efforts to restrain or monopolize trade by petitioning government officials. *Allied,* 486 U.S. at 499, 108 S.Ct. at 1936. The doctrine applies to attempts to influence legislative, executive, judicial, and administrative decisionmaking. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (judicial); *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct.

609, 30 L.Ed.2d 642 (1972) (administrative); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (executive); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (legislative).

In addition, *Noerr* may also protect from liability lobbying activity directed towards a private standard-setting association which is incidental to an effort to influence governmental action. *Allied,* 486 U.S. at 502–03, 108 S.Ct. at 1938–39. In *Allied,* the Supreme Court reached this conclusion in recognition of the fact that petitioning a private association may often be the most effective means of influencing legislation; for local governments, lacking the resources and the expertise to second-guess standards established by nonpartisan private organizations, routinely adopt those standards as law. However, not every concerted effort genuinely intended to influence governmental action is immunized by *Noerr. Id.*

The *Allied* Court formulated a test to determine when attempts to influence a private standard-setting process would receive *Noerr* immunity—a test more easily articulated than applied.[18] Under this test, a party who petitions a private association for the adoption of an anticompetitive standard is immune from liability flowing from the effect the standard has in the marketplace (independent of government action) if the party's lobbying is "a *valid* effort to influence governmental action." *Id.* at 502, 108 S.Ct. at 1938 (emphasis added). Not all efforts are "valid" irrespective of the apparent legitimacy of their aim.

Court for reconsideration in light of its decision on the *Noerr–Pennington* issue. *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.,* No. 87–5854 (C.D.Cal. Jan. 14, 1988) (*"Sessions II"*). This Court, in turn, vacated its Order of March 23, 1987. Order of March 21, 1988.

**16.** Prior to trial, defendant Joor again moved for summary judgment, claiming that plaintiff had not presented sufficient evidence to support its antitrust claims. The Court denied this motion. Order of August 17, 1989.

**17.** There are two additional state law claims brought by Sessions which require disposition. The California Cartwright Act claim does not

appear to have been seriously urged as a ground of recovery at trial and, in any event, any damages awarded on this theory would duplicate those awarded and trebled under § 1. The claim for tortious interference with contractual relations was not proved by Sessions.

**18.** As Judge Sneed pointed out, the type of analysis adopted by the Second Circuit in *Allied* requires "that the antitrust law develop the permissible practices of model code associations, their members and participating non-members." *Sessions I,* 827 F.2d at 465.

Thus, *Noerr* immunity "depends not only on the impact, but also on the context and nature of the activity." *Id.* at 504, 108 S.Ct. at 1940. Applying this test in *Allied,* the Court held that "where ... an economically interested party exercises decisionmaking authority in formulating a product standard for a private association that comprises market participants, that party enjoys no *Noerr* immunity from any antitrust liability flowing from the effect the standard has of its own force in the marketplace." *Id.* at 509–10, 108 S.Ct. at 1942. The *Allied* court counseled that, in determining whether *Noerr* immunity is applicable, courts must distinguish between "activity involving the exercise of decisionmaking authority and market power" which is not protected, and "mere attempts to persuade an independent decisionmaker" which are protected. *Id.* at 510 n. 13, 108 S.Ct. at 1942 n. 13.

The *Allied* test mandates an intensely factual inquiry. A defendant is not entitled to *Noerr* immunity merely because the defendant has complied with the procedural rules of a private association. "An association cannot validate the anticompetitive activities of its members simply by adopting rules that fail to provide such safeguards." *Id.* at 509, 108 S.Ct. at 1942. Similarly, the fact that an association's rules reserve decisionmaking authority to nonpartisan and financially disinterested members is not dispositive. *Allied* requires a court to scrutinize the standard-setting process and to determine whether an economically interested defendant has manipulated that process in such a manner that it would be more accurate to say that the defendant—rather than a nonpartisan private association—"exercised decision making authority" in the adoption of the alleged restraint of trade.[19]

In *Allied,* it was readily apparent that an economically interested defendant had usurped a private association's decision-making power. The defendant packed a private standard-setting body with new members whose only function was to vote against a code provision authorizing the use of a competitor's product. In this case, although Joor's anticompetitive activity was not so blatant, the Court nevertheless has no difficulty in reaching the same conclusion as that reached in *Allied.* Joor is not entitled to *Noerr* immunity from any liability stemming from the effect UFC § 79.601 has of its own force in the marketplace.

It cannot be disputed that Joor was "economically interested" in the enactment of the model fire code provision requiring the removal of leaking tanks from the ground. The provision effectively banned the underground lining of leaking tanks, and forced their owners to purchase new tanks from manufacturers like Joor rather than repair their old ones. In addition, it is clear that Joor, through Robbins, "exercised decisionmaking authority" in the formulation and adoption of UFC § 79.601(d). Joor exercised such authority both within the Article 79 subcommittee and, because of the way the model code-making process worked, within the framework of the entire WFCA.

In the subcommittee, Robbins essentially took over the decisionmaking process in the formulation of § 79.601(d). Robbins took advantage of his position as a subcommittee member and his knowledge of the subcommittee's procedures to secure the inclusion of § 79.601(d) in the subcommittee draft. First, aware that he was considered the most technically competent person on the subcommittee and that his colleagues relied on his advice on engineering issues, Robbins presented a partisan portrait of tank lining. He articulated all of the potential dangers associated with lining, but neglected to discuss the availability of tests to ensure that lining would be perfectly safe. Second, Robbins made knowingly false statements to the subcommittee, tell-

---

**19.** In this respect, *Allied* is contrary to the cases applying the *Noerr* doctrine to direct efforts to influence legislative action. Where a private party petitions a legislative body, courts will refuse to deconstruct the decisionmaking process to ascertain whether the legislature's action was truly independent or instead the product of coercion or manipulation by a private party. *See City of Columbia v. Omni Outdoor Advertising, Inc.,* — U.S. —, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991).

ing them that the lining process would "void" the UL label. Third, Robbins drafted the language of § 79.601(d) and moved the subcommittee to approve it. Fourth, Robbins prevented proponents of tank lining from fully and effectively articulating their contentions regarding the lining process to the subcommittee. He did not make his arguments known to the proponents of tank lining who were scheduled to speak to the subcommittee on March 17, 1981. The proponents were not provided with a copy of the Robbins' letter which set forth specific arguments against the tank lining process. They did not know what arguments he had made, so they obviously had no chance to rebut them. Moreover, Robbins waited until the conclusion of the final subcommittee meeting and until after the proponents of tank lining departed to propose § 79.601(d); as a result, the provision was not really debated at all in the subcommittee. Finally, Robbins made the motion despite the fact that neither the subcommittee members nor the tank lining proponents had been notified that a vote on the issue would be taken.[20]

Taken together, these factors demonstrate beyond question that Joor, through Robbins, rather than a neutral subcommittee, was responsible for the inclusion of § 79.601(d) in the subcommittee draft. As the minutes of the March 18, 1981 meeting reflect, the subcommittee voted for the provision solely on the basis of Robbins' statements, including the misrepresentations that he made.

It is argued, however, that the final decision to include § 79.601(d) in the UFC was made by the WFCA, and then only after review by the entire body. Therefore, the decision to impose the restraint contained in § 79.601(d) was not made by Joor, but by the WFCA. In evaluating whether Joor also exercised decisionmaking authority with respect to § 79.601(d) within the WFCA itself, it is helpful to look by way of analogy to the state action doctrine. In *Parker v. Brown*, 317 U.S. 341, 352, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943), relying on principles of federalism and state sover-

eignty, the Court held that anticompetitive restraints imposed by the state "as an act of government" are exempt from liability under the Sherman Act. In subsequent cases, the Court has recognized that *Parker 's* federalism rationale requires that the state-action exemption apply in suits against private parties where those parties act at the direction of the state. *Patrick v. Burget*, 486 U.S. 94, 99–100, 108 S.Ct. 1658, 1662–63, 100 L.Ed.2d 83 (1988); *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). In cases in which a private party raises a state-action defense, a court must address essentially the same question as the court is required to examine here: whether a nonpartisan entity or an economically interested private person was responsible for an anticompetitive restraint. *See* Einer R. Elhauge, *The Scope of Antitrust Process*, 104 Harv.L.Rev. 667, 687 (1991). The approach taken in these cases is instructive in analyzing the facts of this case.

The Supreme Court has developed a rigorous two-prong test to determine whether anticompetitive conduct by private parties should be deemed to be at the direction of the state. Under this test, " 'the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy," ' " and "the anti-competitive conduct 'must be "actively supervised" by the State itself' [for the restraint to be] fairly attributable to the State." *Patrick*, 486 U.S. at 100, 108 S.Ct. at 1663 (citing *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980)). In explaining the "active supervision" requirement, the Court has stated that:

> [t]he active supervision prong ... requires that state officials have and *exercise* power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy. Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct

---

**20.** Not all members of the subcommittee were present for the March 17 vote.

promotes state policy, rather than merely the party's individual interests.

*Patrick,* 486 U.S. at 101, 108 S.Ct. at 1663 (emphasis added).

Examining what happened in this case in light of this analytical approach, it is clear that the enactment of UFC § 79.601(d) cannot be viewed as fairly attributable to the Western Fire Chiefs. The WFCA did not authorize Robbins or the Article 79 subcommittee to draft a provision relating to tank lining. Rather, the Western Fire Chiefs delegated to the subcommittee the task of integrating the 1979 UFC and NFPA Standard 30, neither of which addressed the subject of tank lining. Moreover, neither the WFCA nor the UFC committee actively supervised Robbins or the Article 79 subcommittee in the code-promulgating process. Although the UFC committee and the WFCA no doubt had the power to review subcommittee proposals, neither group, in fact, exercised this power with respect to the provision banning tank lining. *Cf. Ticor Title Ins. Co.,* Trade Reg. Rep. (CCH) ¶ 22,744, at 22,443 (FTC 1989) ("To establish active state supervision [where party claims state action defense,] it is not enough merely to show ... that the state statute governing the anticompetitive activity provides some mechanism for regulatory oversight. There must be a showing that the state actually exercised its authority."); 1 Phillip Areeda & Donald F. Turner, *Antitrust Law,* ¶ 213f, at 77–79 (1978) (privately set restraint of trade cannot be immunized under *Parker* doctrine by inaction of state agency). The UFC committee simply did not review § 79.-601(d). The committee did not examine proposed code changes unless a member of the subcommittee which proposed the change raised an objection at the UFC committee meeting; no member of the UFC committee, nor any other person at the UFC committee meeting in April 1981, questioned the proposed ban on under-

ground tank lining. Similarly, the WFCA did not closely examine § 79.601(d). At the August 27–29, 1981 WFCA meeting, the Association was presented with the voluminous Article 79 as well as other proposed code changes. The WFCA delegated the task of rewriting Article 79 to a subcommittee precisely because WFCA officials had neither the time nor the expertise to do the work. The WFCA relied on the judgment of its subcommittee. The result was that both the UFC committee and the WFCA, in effect, rubber stamped the Article 79 subcommittee's proposal to ban the underground lining of tanks.[21] The most compelling evidence of this is that fire officials, familiar with the WFCA code-making process, did not wait for final WFCA approval, but instead enforced the UFC as soon as the Article 79 subcommittee finished its work.

In this case, because the disinterested fire officials, the UFC committee and the WFCA did not in fact exercise their power to review the proposed § 79.601(d), it was left to Joor, who "organized and orchestrated the actual exercise of the Association's decisionmaking authority "to set the standard." *Allied,* 486 U.S. at 507, 108 S.Ct. at 1940. Accordingly, Joor is not entitled to immunity from liability flowing from the effect § 79.601(d) had of its own force in the marketplace.

**B. Antitrust Violation**

■ Joor contends that, regardless of whether it is protected by *Noerr,* Sessions has not established a violation of § 1 of the Sherman Act. To prove a violation of § 1 of the Sherman Act, three elements must be established. A plaintiff must show (1) that there was combination, conspiracy, or agreement to restrain trade, (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or

---

**21.** Joor contends that Sessions is responsible for any failure on the part of either the WFCA or the UFC subcommittee to review proposed § 79.601(d). According to Joor, Sessions should have objected to the proposal in the UFC subcommittee meeting or in the subsequent WFCA meeting. The antitrust laws, however,

do not impose such an exhaustion of remedies requirement on plaintiffs. *See* Elhauge, *supra,* at 712–17 (antitrust defendant not entitled to state action defense simply because plaintiff has not pursued all state remedies before bringing antitrust claim) (citing cases).

rule of reason analysis, and (3) that the restraint affected interstate commerce.[22] *E.W. French & Sons v. General Portland, Inc.,* 885 F.2d 1392, 1397 (9th Cir.1989); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 632–33 (9th Cir.1987).

■ Section 1 claims are subject to a rule of reason analysis "unless the challenged action falls into the category of 'agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal [per se] without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.' "[23] *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985) (citation omitted); *see Los Angeles Memorial Coliseum Comm'n v. NFL,* 726 F.2d 1381, 1387 (9th Cir.) ("*NFL* "), *cert. denied,* 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984); *Bhan v. NME Hosps., Inc.,* 929 F.2d 1404, 1410 (9th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991); *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.,* 890 F.2d 139, 151 (9th Cir.1989) (en banc). As standard-setting by a private association has not been found to fall within one of the per se categories, the antitrust valid-

ity of the restraint alleged here must be evaluated under the rule of reason.[24] *Allied,* 486 U.S. at 500–01, 506–07, 108 S.Ct. at 1937–38, 1940–41.

The rule of reason requires the fact finder to weigh the anticompetitive effects of an alleged restraint against its procompetitive benefits to determine whether the restraint imposes an unreasonable burden on competition.

A section one claimant must initially prove three elements: (1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually injures competition. After the claimant has proven that the conspiracy harmed competition, the fact finder must balance the restraint and any justifications or pro-competitive effects of the restraint in order to determine whether the restraint is unreasonable. This balancing process requires a thorough examination into all the surrounding circumstances.

*Oltz v. St. Peter's Community Hosp.,* 861 F.2d 1440, 1445 (9th Cir.1988) (citations omitted).[25]

■ Generally, proof that *Noerr* is inapplicable does not establish a violation of the Sherman Act. *See* 1 Areeda & Turner, *supra,* ¶ 204e2, at 51. In the context of a

**22.** Section 1 of the Sherman Act provides that "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Although this language literally prohibits *every* agreement, or other concerted activity in restraint of trade, courts have long recognized that Congress could not have intended this result; and courts have, therefore, interpreted federal antitrust laws to proscribe only unreasonable restraints on competition. *See Standard Oil Co. v. United States,* 221 U.S. 1, 65, 31 S.Ct. 502, 517, 55 L.Ed. 619 (1911); *Bhan v. NME Hosp., Inc.,* 929 F.2d 1404, 1409 (9th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991); *Los Angeles Memorial Coliseum Comm'n v. N.F.L.,* 726 F.2d 1381, 1387 (9th Cir.), *cert. denied,* 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984).

**23.** Practices which are considered "illegal per se include horizontal price-fixing, division of markets, and certain tying arrangements." *See Bhan,* 929 F.2d at 1410.

**24.** In this case, there is no contention that Joor's conduct should be governed by a per se rule.

**25.** A recent Ninth Circuit decision describes the analysis in a slightly different manner.

To meet his initial burden in establishing that the practice is an unreasonable restraint of trade, plaintiff must show that the activity is the type that restrains trade and that the restraint is likely to be of significant magnitude....

....

Should the plaintiff satisfy his initial burden, the defendant must offer evidence of pro-competitive effects. The plaintiff, driven to this point, must then try to show that any legitimate objectives can be achieved in a substantially less restrictive manner. Finally, the court must weigh the harms and benefits to determine if the behavior is reasonable on balance.

*Bhan,* 929 F.2d at 1413.

private standard-setting association, however, "[t]he issue of immunity ... collapses into the issue of antitrust liability." *Allied*, 486 U.S. at 509, 108 S.Ct. at 1942. In other words, in proving that a defendant who lobbies a private association for the adoption of a standard is not immune under *Noerr*, a plaintiff necessarily satisfies *some* of the elements of a § 1 claim.

Obviously, proof that a private association's standard-setting activities do not qualify for *Noerr* immunity is also proof of the "concerted action" requirement of § 1. Under *Allied*, a defendant who exercises decision-making authority in the formulation of a private association's product standard has, in practical effect, agreed with other members of the association to restrain trade.[26] "Agreement on a product standard is, after all, implicitly an agreement not to manufacture, distribute, or purchase certain types of products." *Allied*, 486 U.S. at 500, 108 S.Ct. at 1937.

In addition, in proving that *Noerr* does not apply because the defendant has subverted the standard-setting process, a plaintiff has, of necessity, also proved part of its rule of reason case: the plaintiff has shown that the alleged restraint of trade lacks procompetitive benefits. As pointed

out by the *Allied* Court, standards set in private associations "based on the merits of objective expert judgments and through procedures that prevent the standard-setting process from being biased by members with economic interests in stifling product competition, ... can have significant procompetitive advantages." *Id.* at 501, 108 S.Ct. at 1937. Where, however, the decisionmaking process of a private standard-setting association has been subverted, a standard produced by that process does not promote competition. "[T]he hope of procompetitive benefits [in standard-setting] depends upon the existence of safeguards sufficient to prevent the standard-setting process from being biased by members with economic interests in restraining competition." *Id.* at 509, 108 S.Ct. at 1942. If the safeguards to objectivity are not there, neither are the benefits.

This "collapse" of the immunity and liability issues does not obviate the need for plaintiff to establish the remaining elements of an antitrust violation. Although the *Noerr* inquiry establishes that the alleged restraint of trade lacks procompetitive benefits, the plaintiff must still show anticompetitive harm to satisfy its burden under the rule of reason.[27] Further, the

---

26. As Sessions named only Joor as a defendant in this action, it is unnecessary to determine whether any members of the WFCA or the Article 79 subcommittee besides those who were present for the March 17, 1981 vote could be held individually liable for the antitrust violation. Some decisions suggest that any member of a private association who is aware of illegal action by the association and does not protest may be liable under the Sherman Act. *See, e.g., Phelps Dodge Ref. Corp. v. FTC,* 139 F.2d 393, 396 (2d Cir.1943). In more recent cases, courts have held that only members who actively participate in the association's illegal act may be liable. *See, e.g., Kline v. Coldwell, Banker & Co.,* 508 F.2d 226, 232 (9th Cir.1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975); *see also* 7 Phillip E. Areeda, *Antitrust Law* ¶ 1477, at 346 n. 12 (1986) (suggesting that it is problematic to hold organization's members individually liable). Even under the more restrictive standard, members of the Article 79 subcommittee who voted for § 79.601(d) clearly could be held liable under the Sherman Act. These subcommittee members knew that Robbins was economically interested in restricting tank lining and knew that the subcommittee had not followed procedures to ensure that tank

lining would be addressed in an objective manner. Nevertheless, they voted to ban tank lining.

27. Sessions contends that, in proving that the defendant has failed the *Allied* test, it has established *all* of the elements of an antitrust violation. The Court rejects this argument. First, the *Allied* court stated that actions taken by a defendant to influence standard-promulgation by a private association, if not protected by *Noerr,* should be analyzed under the rule of reason. *Allied,* 486 U.S. at 500–01, 506–07, 108 S.Ct. at 1937–38, 1940–41. Second, plaintiff's argument proceeds on the erroneous assumption that a standard-setting process which has been biased by an economically interested participant will necessarily produce standards that have anticompetitive effects. In *Allied,* however, the Court explicitly declined to endorse this assumption, noting that product standards set by private associations have a serious *potential* for anticompetitive harm. *Id.* at 501, 108 S.Ct. at 1937. The Supreme Court has cautioned against assuming the existence of anticompetitive effects where "'economic impact ... is not immediately obvious.'" *Consolidated Metal Prod., Inc. v. American Petroleum Inst.,*

plaintiff must demonstrate that the alleged restraint affected interstate commerce.

▮ In this action, Sessions has shown that Joor's activities adversely affected competition between tank liners and tank manufacturers. As a result of the adoption of the UFC, the business of underground tank lining was brought to a halt in many areas in California and other western states. The UFC provision deprived customers of the option of choosing the less expensive lining process instead of replacement. Thus, the Court need not engage in sophisticated market analysis to conclude that § 79.601(d) harmed competition. Where plaintiff shows "actual detrimental effects such as a reduction of output," there is no need for elaborate analysis. *FTC v. Indiana Fed. of Dentists,* 476 U.S. 447, 460, 106 S.Ct. 2009, 2019, 90 L.Ed.2d 445 (1986); *Les Shockley Racing, Inc. v. National Hot Rod Ass'n,* 884 F.2d 504, 508 (9th Cir.1989); *Oltz,* 861 F.2d at 1448. As UFC § 79.601(d) adversely affected competition without promoting competition in some other respect, the Court has no difficulty finding that Joor unreasonably restrained trade.

▮ The Court would reach this conclusion even under the "traditional" rule of reason inquiry; for the defendant has failed to advance any *legitimate* justification for UFC § 79.601(d). Defendant suggests that the model fire code provision promoted safety. But extra-competitive concerns, such as safety, are usually given no weight under the rule of reason. *National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 688–95, 98 S.Ct. 1355, 1363–67, 55 L.Ed.2d 637 (1978) (holding that professional association's rule prohibiting competitive bidding violates Sherman Act § 1 regardless of the rule's effect on public safety).[28] "[An] attempt to

[justify a restraint of trade] on the basis of the potential threat that competition poses to the public safety ... is nothing less than a frontal assault on the basic policy of the Sherman Act.... [T]he statutory policy precludes inquiry into the question whether competition is good or bad." *Id.* at 695, 98 S.Ct. at 1367. Moreover, even if safety were a legitimate justification for UFC § 79.601(d), the Court would find the model code provision to be unreasonable; for a rule significantly less restrictive than UFC § 79.601(d) could easily have ensured safety in the tank lining process. *See N.F.L.,* 726 F.2d at 1396 (availability of less restrictive alternatives is pertinent in evaluating reasonableness of restraint). A rule that prohibited underground lining of a tank unless certain structural specifications were met (as measured by designated tests) would have achieved the same end as the broad proscription contained in § 79.-601(d).

Further, there is little question that Joor's activities affected interstate commerce.[29] Sessions, a California company, imported all of the epoxy which it used to line tanks from a company located in Florida. Moreover, Sessions lined many tanks in western states other than California. All of these activities were disrupted by what Joor did. *See McLain v. Real Estate Bd.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980).

### C. Causation

One of the principal contentions made by Joor is that the injury to Sessions was not the result of anything done by Joor, but rather was the result of government action—the adoption of the UFC provision by local governments, or, in situations where there was no formal adoption, the enforce-

---

846 F.2d 284, 290 (5th Cir.1988) (citing *FTC v. Indiana Fed. of Dentists,* 476 U.S. 447, 458–59, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986)) (holding that trade association's failure to certify equipment manufactured by plaintiff does not necessarily have anticompetitive effects and should not be treated as per se illegal).

**28.** However, the *Allied* Court did allude to the procompetitive benefits resulting from the pro-

mulgation of safety standards. *Allied,* 486 U.S. at 501, 108 S.Ct. at 1937.

**29.** The parties have stipulated that the alleged restraint on competition operated to adversely affect interstate trade and commerce in the business of lining leaking underground storage tanks in the western United States.

ment by public fire officials of the ban contained in the provision. Joor argues not only that there is no significant causal connection between the claimed antitrust violation and Sessions' injury, but also that the injury did not flow from the acts of Joor claimed to be in violation of the antitrust laws. Put simply, Joor contends that Sessions has failed to prove both causation and antitrust injury.

■ The Court rejects the contention that the adoption of the UFC by local governments caused the injury plaintiff claims in this case. "To prevail under the Sherman Act, a plaintiff must not only show an unlawful restraint of trade, but also prove that the defendant is legally responsible for this restraint." *Sessions I,* 827 F.2d at 464; *see also Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 143–44, 88 S.Ct. 1981, 1986–87, 20 L.Ed.2d 982 (1968) (White, J., concurring). In proving defendant's legal responsibility for a restraint, however, an antitrust plaintiff is not required to establish that the defendant's antitrust violation was the sole cause of its injury. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969). "It is enough that the illegality is shown to be a material cause [of plaintiff's] injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury." *Id.* Accordingly, where plaintiff proves that it has suffered financial loss in the wake of the defendant's unlawful action, the defendant who raises what can be referred to as an "intervening cause defense" bears the burden of proving the existence of that intervening cause.

■ In this case, both sides agree that UFC § 79.601(d) was adopted by a number of local governments in California, although the record does not reflect specifically which local governments took such action or when they did it. Nor does the record reflect how Sessions' applications for permits to carry on tank lining were treated by any particular local government before as opposed to after it adopted the UFC provision. The Court has no evidence from which it could conclude that any specific refusal to permit tank lining was the result of any specific local ordinance being enacted.[30] What Sessions claims, and what it proved, was that its business was expanding prior to the subcommittee's action, and that it slumped dramatically after the subcommittee approved UFC § 79.601(d). It also proved that it was being granted permits freely before the subcommittee's action and was denied them thereafter, and that it was denied them even before any local government would have had the opportunity to consider and adopt UFC § 79.-601(d) as law. Finally, Sessions proved that almost immediately after the adoption of UFC § 79.601(d) by the subcommittee and prior to its adoption by the WFCA, Joor "marketed" the stigma which it had caused the subcommittee to place on tank lining by sending letters to public agencies and customers urging its prohibition.[31] That is more than sufficient for the Court to conclude that there is a significant causal connection between Joor's actions and Sessions' injury, and that, if anything, the later adoption of UFC § 79.601(d) by various local governments only served to exacerbate Sessions' already existing injury. Sessions has established "independent marketplace harm" caused by the stigma, separate and apart from that caused by the

---

**30.** On this record, the Court could not apply the teaching of *City of Columbia v. Omni Outdoor Advertising, Inc.,* —— U.S. ——, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), but also does not find that its application is warranted.

**31.** There are a number of letters in evidence sent by Mr. Robbins to various entities encouraging the prohibition of in-place lining of leaking tanks. These letters included four letters sent to the American Petroleum Institute ("API"), a trade organization of oil companies

which, in turn, were the largest customer groups of both Sessions and Joor, in which Robbins advised the API of its moral and legal responsibility not to permit tank lining to continue. Similar letters were sent to the Underwriters Laboratories, Inc. and the National Fire Protection Association. Later, Robbins also sent letters like these to the County of Sacramento, the City of Los Angeles, the City of San Diego and the State of California Water Resources Board.

adoption of UFC § 79.601(d) by local governments.

The Court also rejects Joor's contention that enforcement of UFC § 79.601(d) by local fire officials, and not Joor's actions, caused the injury claimed by Sessions. However, this contention is rejected on separate grounds, as there is specific evidence of this type of local government action in the record. In weighing this contention, the Court must focus on the legal effect to be given to the fact that while the anticompetitive restraint was based on a private standard, not a local ordinance, it was nevertheless imposed by a public official who presumably had an executive duty to take action. As to this contention, the Court concludes that the public official's action does not relieve an economically interested person who exercised decisionmaking authority to formulate the private standard from liability he would otherwise have under the antitrust laws.[32]

There are certainly many cases in which a government official's adoption of an anticompetitive restraint at the behest of a private party has resulted in a finding that any injury to competition was the result of a governmental act rather than the private party's act. "The Sherman Act was not intended to make private parties liable, in the ordinary case, for governmental acts." *Sessions I,* 827 F.2d at 464. This is the conclusion reached, either explicitly or implicitly, in many cases finding *Noerr–Pennington* immunity. In *Pennington,* for example, Phillips charged the United Mine Workers and several large coal companies with conspiring to eliminate competition in violation of the Sherman Act by persuading the United States Secretary of Labor to adopt a high minimum wage for coal miners. In holding that the *Noerr–Pennington* doctrine covered this petitioning activity, the court explained: "It is clear under *Noerr* that Phillips could not collect any damages under the Sherman Act for any injury which it suffered from the action of the Secretary of Labor.... [T]he action taken to set a minimum wage for government purchases of coal was the act of a public official." *Pennington,* 381 U.S. at 671, 85 S.Ct. at 1594; *see also* Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶¶ 201, 206.1, at 14–16, 78 (Supp.1990) (*Noerr* doctrine predicated in part on the notion that a government rule which effects an anticompetitive restraint is "proximately caused" by the government and not by the private party who persuades the government to adopt the rule); *In re Airport Car Rental Antitrust Litig.,* 521 F.Supp. 568, 574 (N.D.Cal.1981) (holding defendants immune under *Noerr* where restraint "flows, not from the joint action of defendants, but from the [state] airport authorities' exercise of their statutory authority and duty to manage the facilities in their charge"), *aff'd,* 693 F.2d 84 (9th Cir. 1982), *cert. denied,* 462 U.S. 1133, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983).

Courts which have found government action to be an "intervening cause" breaking the link between a private party's pursuit of an anticompetitive restraint and a plaintiff's injury have been motivated by essentially three policy considerations. First, antitrust courts are reluctant to second-guess the decisions of better-informed government officials. This is especially true in the legislative context.[33] *See, e.g.*

---

**32.** The *Allied* court did not decide whether a party who subverts the standard-setting process could be held liable for damages flowing from the adoption of an anticompetitive standard by government officials. In *Allied,* the Court expressly avoided this issue, noting that plaintiff was awarded damages solely "on the theory 'that the stigma of not obtaining [Code] approval of its products and [defendant's] "marketing" of that stigma caused independent marketplace harm to [plaintiff] in those jurisdictions *permitting* use of [the products]." *Allied,* 486 U.S. at 498 n. 2, 108 S.Ct. at 1936 n. 2 (citing *Indian Head, Inc. v. Allied Tube & Conduit Corp.,* 817 F.2d 938, 941 n. 3 (2d Cir.1987), *aff'd,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988)).

**33.** As a leading antitrust treatise has noted:
[G]overnment learns about reality through a complex battle of contending political forces which speak truths and partial truths and exert diverse pressures upon various persons and institutions. Society recognizes that politics is often a rough and tumble affair. Many would feel, moreover, that definition and balancing are better left to legislatures, which have more political experience than the courts and which may be better able to appreciate

*City of Columbia v. Omni Outdoor Advertising, Inc.,* — U.S. —, 111 S.Ct. 1344, 1352–56, 113 L.Ed.2d 382 (1991) (declining to recognize "conspiracy exception" to the *Noerr–Pennington* doctrine for fear that exception would shift from elected officials to federal judges and juries the determination of what is or is not in the public interest). Second, antitrust courts are hesitant to "deconstruct[ ] ... the governmental [decisionmaking] process" in order to assess whether a particular decision was the result of an "independent" governmental choice or rather the result of a private party's improper influence. *Id.,* 111 S.Ct. at 1352; *see also* Areeda & Hovenkamp, *supra,* ¶ 204.1d, at 69–71 (noting that it is often impracticable, especially in the legislative context, to establish a material connection between a private party's petitioning activity and a government-imposed restraint of trade). Third, antitrust courts often hold that a restraint is the result of government, as opposed to private, action to protect the citizen's first amendment interest in petitioning the government and to ensure that the government is not deprived of useful information. *See, e.g., Noerr,* 365 U.S. at 137–38, 81 S.Ct. at 529–30.

Where these policy reasons do not obtain, however, courts have declined to find that government action is a "intervening cause" which shields the defendant who sought to bring about that action from antitrust liability. The best illustration is in the cases holding that the knowing submission of false information by a defendant in an adjudicatory proceeding is not protected under *Noerr. See California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 512–13, 92 S.Ct. 609, 612–13, 30 L.Ed.2d 642 (1972); *Boone v. Redevelopment Agency of San Jose,* 841 F.2d 886, 895–96 (9th Cir.), *cert. denied,* 488 U.S. 965, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988). In this context, there is no risk that an antitrust court will interfere with a branch of government better able to evaluate the

the balance of contending forces. An antitrust suit may be too limited a context for that purpose.
1 Areeda & Turner, *supra,* ¶ 204c, at 47.

public interest. Moreover, in this setting, the causal nexus between the defendant's submission of false information and the decision of the adjudicatory body can usually be established by looking at the record. No "deconstructing" of the government decisionmaking process is involved. *See* Areeda & Hovenkamp, *supra,* ¶ 204.1d, at 69–71. In addition, an individual has a minimal First Amendment interest in deliberately lying to an adjudicator. *See Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1261–62 (9th Cir.1982), *cert. denied,* 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983) (deliberate misrepresentations of fact to an adjudicatory body or to an administrative body for anticompetitive purpose not entitled to first amendment protection).

Similarly, some courts have concluded that knowing misrepresentations in an administrative proceeding made to induce an anticompetitive restraint are not entitled to *Noerr* protection. *See Clipper Exxpress,* 690 F.2d at 1259–63; *Israel v. Baxter Lab, Inc.,* 466 F.2d 272 (D.C.Cir.1972); *Woods Exploration & Producing Co. v. Aluminum Co. of Am.,* 438 F.2d 1286, 1296–98 (5th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972); Areeda & Hovenkamp, *supra,* ¶ 204.1, at 66–73 (citing cases). In *Woods Exploration,* plaintiffs charged that the defendant oil and gas producers filed false information with the Texas Railroad Commission to trigger a decision limiting plaintiffs' production allowances. The court held that the administrative decision was not an intervening cause of plaintiffs' injury and declined to afford *Noerr* protection to the false statement.

■ Most importantly, in *Sessions I,* the Ninth Circuit held that where an antitrust defendant misrepresents facts to an official acting in his administrative capacity, those misrepresentations will be actionable despite the *Noerr–Pennington* doctrine.[34] 827 F.2d at 468. The official's

**34.** The Ninth Circuit held that such misrepresentations fell within the sham exception to the *Noerr* doctrine. *Sessions I,* 827 F.2d at 465 n. 5. In *Allied,* the Court explained that the sham

decision to impose a restraint on the basis of the defendant's knowing misrepresentations is not to be considered an intervening cause of plaintiff's antitrust injury. This case falls within the rule announced in *Sessions I*. In manipulating the standard-setting process, Joor caused the misrepresentation to be made to public fire officials that the Article 79 subcommittee, the UFC Committee and the WFCA had arrived at an objective and nonpartisan decision to ban the underground lining of tanks. These fire officials, plaintiff has shown, relied on this misrepresentation in denying permits to Sessions to engage in tank lining. In fact, in his letters and statements to fire officials, Robbins urged that they had an obligation to enforce the decision reached in the UFC standard-setting process even though he knew that that process had been subverted. Under these circumstances, the denial of permits by public officials cannot relieve Joor for liability for the injury to Sessions. Sessions' injury was caused by Joor and it flowed directly from Joor's antitrust violation.[35]

### D. Antitrust Damages

After establishing that a defendant's antitrust violation caused the requi-

site injury, a plaintiff is afforded considerable latitude in proving damages.[36] *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565–66, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981); *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir.1984), *cert. denied*, 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985). Uncertainty as to the amount or extent of damages will not bar recovery. *J. Truett Payne Co.*, 451 U.S. at 565–66, 101 S.Ct. at 1929. "An antitrust plaintiff must simply provide evidence to support a ' "just and reasonable estimate of the damage." ' " *Handgards, Inc.*, 743 F.2d at 1297 (citations omitted).

In this case, Sessions presented expert testimony to establish that it lost $1,160,606.00 in net profits as a result of the stigma caused by Joor's actions in violation of the antitrust laws. Plaintiff's expert testified that he derived this figure by comparing Sessions' business with the businesses of ·other licensed applicators of epoxy produced by the Bridgeport Chemical Company which were operating in jurisdictions unaffected by the WFCA's pronouncement.[37] This method of estimating

exception to *Noerr* did not encompass this type of conduct. *Allied*, 486 U.S. at 508 n. 10, 108 S.Ct. at 1941 n. 10. "A 'sham' situation involves a defendant whose activities are 'not genuinely aimed at procuring favorable government action' at all, not one 'who "genuinely seeks to achieve his governmental result, but does so *through improper means.*" ' " *Omni*, 111 S.Ct. at 1354 (citations omitted). The *Allied* Court, while it objected to the Ninth Circuit's label, did not question its reasoning.

**35.** The conclusion reached here is also supported by *City of Long Beach v. Standard Oil Co.*, 872 F.2d 1401 (9th Cir.), *amended by*, 886 F.2d 246 (1989), *cert. denied*, 493 U.S. 1076, 110 S.Ct. 1126, 107 L.Ed.2d 1032 (1990). In *City of Long Beach*, the plaintiff city filed an antitrust action against six major oil companies, alleging that the companies conspired to fix and maintain uniform, noncompetitive posted prices for crude oil produced from a field owned by the city. The district court granted summary judgment for the defendants on the ground that the federal government, which had established a federal price control program for crude oil, was the legal cause of any injury to the city. The Ninth Circuit reversed, stating that the federal program would not be a supervening cause of

plaintiff's injury if plaintiff could show that the federal government would have set price ceilings at a higher level in the absence of the alleged conspiracy. *Id.* at 1408–09.

> The establishment of price ceilings by the federal government, after the alleged conspiracy began, does not in itself mean that the companies' conduct could not have caused the injuries.... [I]f the [federal] price ceilings were based on prices set artificially low as a result of an unlawful conspiracy, liability should still exist.... Mere ratification by government officials does not absolve an otherwise illegal conspiracy.
> *Id.*

**36.** All damages, however, must be traceable to an injury that was, in fact, caused by the defendant. *MCI Communications Corp. v. American Tel. & Tel.*, 708 F.2d 1081, 1168 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

**37.** The plaintiff's damage study, Exhibit 308, covers fiscal years 1981–1988. The calculation for the first year of the damage study is not based on the same theory as the subsequent years, but rather on the number of permits

lost profit damages—the "yardstick" method—has been endorsed by the courts. *See, e.g., Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 257–58, 66 S.Ct. 574, 576–77, 90 L.Ed. 652 (1946); *Syufy Enters. v. American Multicinema, Inc.,* 793 F.2d 990, 1102–03 (9th Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987). As defendant introduced no testimony refuting plaintiff's estimate, plaintiff may recover its lost profits, trebled under 15 U.S.C. § 15(a) (1988), for a total of $3,481,818.00. Plaintiff is also entitled to recover its cost of suit and its attorney's fees pursuant to 15 U.S.C. § 15(a).

 As to the attorney's fees, the Court has reviewed the plaintiff's motion in support of its application for an award of fees and has considered the factors set forth in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). In particular, the Court assigns considerable weight to the novelty and difficulty of the questions involved, a factor which can hardly be the subject of controversy given the extent of the appellate court attention directed to this case. To the same point, having reread the transcript at the trial and having reflected on the experience and ability of counsel, the Court agrees that only the most skilled attorney could find a path through the thicket of issues which finally grew up here. Accordingly, the Court makes an award of $859,844.00 for attorney's fees, which is the lodestar amount without the requested adjustment to current time rates, and also without the application of a multiplier.

## II. Intentional Interference With Prospective Advantage Claim

 The California Supreme Court has articulated the elements of the tort of intentional interference with prospective economic advantage in a number of cases: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Youst v. Longo,* 43 Cal.3d 64, 71 n. 6, 729 P.2d 728, 733 n. 6, 233 Cal.Rptr. 294, 298 n. 6 (1987). To prove this tort, a plaintiff must establish that it was "reasonably *probable*" that economic advantage would have been realized but for the defendant's interference. 43 Cal.3d at 71, 729 P.2d at 733, 233 Cal. Rptr. at 298.

 In this case, Sessions demonstrated that it had actual and prospective economic relationships with oil companies and others who owned underground tanks. Also, Sessions showed that there was a reasonable probability that these customers would have done business with it but for Joor's activities which led to the adoption of UFC § 79.601(d). Further, Joor knew that it competed with Sessions and knew of the existence of the business relationships between Sessions and its actual and potential customers. In this regard, the evidence shows that a large number of Sessions' customers were also customers of Joor. Nevertheless, Joor engineered and orchestrated, with the specific motive and purpose of disrupting Sessions' relationship with its customers, the adoption of UFC § 79.601(d).[38] As discussed above, Joor's activities imposed a stigma on Sessions' business, thereby damaging it severely.[39]

denied in California. A small number of these denials occurred before March 17, 1981. Nevertheless, the Court finds an award of damages for the first year is justified based on all of the evidence, including that of Joor's activities prior to the March 17, 1981 meeting.

**38.** "It is the intentional attainment of an unjust advantage which underlies the requirement that the interference be improper...." *Devoto v.*

*Pacific Fidelity Life Ins. Co.,* 618 F.2d 1340, 1348 (9th Cir.1980).

**39.** It is not clear under the California law of tortious interference whether damages can be awarded for the loss of net profit to be derived from potential business with unspecified customers. *Rickards v. Canine Eye Registration Found., Inc.,* 704 F.2d 1449 (9th Cir.), *cert. denied,* 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683

Accordingly, plaintiff is entitled to judgment on this claim in the amount of $1,160,606.00. Since the Court has awarded all of the damages sought by plaintiff on the antitrust claim, the damages on the tort claim should not be added to those awarded on the antitrust claim.[40] Thus, the total award is $1,160,606.00, the damages on the antitrust claim to be trebled. The Court finds that an award of punitive damages would be inappropriate in this case. Plaintiff is also awarded its cost of suit on the tort claim.

(1983); *In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F.Supp. 1262, 1271 (N.D.Cal.1988), *aff'd mem. sub nom. Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir.1990). However, in a situation where the plaintiff's established concern competes with the defendant and is put out of business by the defendant's wrongful conduct, there should be "a limit to the exactness the defendant[ ] can demand" in proving damages. *Independence Tube Corp. v. Copperweld Corp.*, 691 F.2d 310, 329 (7th Cir.1982), *rev'd on other grounds*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

40. The problem of duplication of damages in cases involving both antitrust and tort claims has been addressed by a number of district courts. *See Independence Tube Corp. v. Copperweld Corp.*, 691 F.2d 310, 327 (7th Cir.1982).