The appeal is DISMISSED for lack of jurisdiction.

**SESSIONS TANK LINERS, INC.,**
Plaintiff-Appellee,

v.

**JOOR MANUFACTURING, INC.,**
Defendant-Appellant.

No. 92-55085.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 8, 1993.

Decided Feb. 25, 1994.

**296**

Jerome I. Braun, Farella, Braun & Martel, San Francisco, California, and David E. Lundin, Rancho Santa Fe, California, for the defendant-appellant.

Maxwell M. Blecher, Blecher, Collins & Wienstein, Los Angeles, California, for the plaintiff-appellee.

Andrew D. Hutton, Michael J. Shockro, Latham & Watkins, Los Angeles, California, and Raymond A. Tabar, John G. Nelson, Thomson & Nelson, Whittier, California, for the amicus.

Before: CANBY, and NORRIS, Circuit Judges, and TANNER *, District Judge.

CANBY, Circuit Judge

Appellant Joor Manufacturing, Inc. ("Joor"), challenges the district court's decision holding Joor liable for anticompetitive conduct in violation of federal antitrust laws and for the California tort of intentional interference with prospective economic advantage. Through deliberate misrepresentation, Joor caused a prominent standard-setting organization to amend its influential model fire code to the disadvantage of Joor's competitor, appellee Sessions Tank Liners, Inc. ("Sessions").

Because Sessions has failed to prove that its injuries result from anything other than governmental action, we reverse the district court's judgment on the antitrust claims. We also conclude that Joor is shielded from liability on the California commercial tort

claim. We therefore reverse the district court's judgment on that claim as well.

## BACKGROUND

The parties in this case are commercial competitors. Joor is in the business of manufacturing steel tanks designed for the underground storage of hazardous fluids. Sessions repairs leaking storage tanks in place by cutting them open, lining their interiors with a protective coating of epoxy, and resealing them.

The cost of lining a tank is about the same as the cost of a new tank. Tank lining is cheaper than tank replacement, however, because lining does not entail the additional costs of removing and discarding the leaking tank and installing a new one. Tank lining, moreover, does not require the lengthy interruption of business that tank replacement often involves.

In most of the localities in which Sessions did business prior to bringing this suit, tank lining required a permit. Authority to issue a tank lining permit usually rested with the local fire marshal or fire chief. Before the events that precipitated this law suit, fire authorities granted tank lining permits to Sessions without reluctance, and Sessions's business grew continually.

The Western Fire Chiefs Association (WFCA) is a private, nonprofit organization whose voting membership comprises fire chiefs and other governmental employees. The WFCA periodically promulgates a revised Uniform Fire Code (UFC), a model safety code prescribing safety standards and procedures. Many local governments formally adopt each successive UFC revision as municipal law. In some cities and towns where the UFC has not been formally enacted into law, local officials enforce the UFC by refusing to issue permits for structures or activities that are not in conformance with the code.

During the time of Joor's involvement with the WFCA, revision of the UFC was a three-phase process. In the first phase, designat-

---

* The Honorable Jack E. Tanner, Senior United States District Judge for the Western District of Washington, sitting by designation.

ed subcommittees of the standing UFC Committee inquired into various fire safety issues and drafted proposed revisions in accordance with their findings. After the proposed revisions were published in two trade journals, the UFC Committee convened to review each proposal and to vote on recommending its adoption or rejection by the WFCA. The meeting was open to subcommittee members and members of the public, who could register objections to the suggested revisions. The UFC Committee focused its review on revisions that were the subject of an objection. Proposals that were not the subject of an objection were recommended for approval.

In the final phase of the UFC revision process, the UFC Committee published in trade journals the proposed code changes and accompanying UFC Committee recommendations. At its annual meeting, the full body of the WFCA voted on the proposed revisions. Members of the public could attend this meeting and express support for or opposition to any proposal under consideration. The WFCA usually adopted proposed revisions to which no objections were made. If a majority of the WFCA approved a proposed revision, the revision was incorporated into the UFC.

Unlike the UFC Committee and the WFCA, whose memberships were limited to public officials, UFC subcommittees included industry representatives and members of the public. The conduct at issue in this case arises from appellant Joor's involvement—through its president, Howard Robbins—with the UFC subcommittee charged with revising UFC Article 79, the section of the code that prescribes guidelines for the handling and storage of flammable liquids. Robbins volunteered to work on the subcommittee and took part in revising the provisions relating to underground storage tanks. Robbins was assigned the task of reviewing the parts of Article 79 that dealt with depth and location specifications for underground storage tanks. At the time he became involved with the subcommittee, Article 79 did not address tank lining or require that leaking tanks be removed.

Alarmed at the news of Robbins's participation in the code revision process, representatives from Sessions provided the subcommittee with materials about the tank lining process and were granted an opportunity to make a presentation on the subject, but the presentation was scheduled for the subcommittee's final meeting. Prior to the meeting, Robbins circulated among subcommittee members a letter in which he raised concerns about the safety of tank lining and stated that the WFCA might incur liability for sanctioning the process because it would void a tank's Underwriters Laboratories (UL) certification.

After the Sessions representatives made their presentation and left the meeting, Robbins rallied the subcommittee to amend Article 79 to include a provision requiring that leaking storage tanks be removed from the ground. Robbins reasserted that the lining process was unsafe and would void the UL label, subjecting the WFCA to liability. In spite of their awareness of Robbins's economic interest in a tank lining ban, the subcommittee unanimously approved Robbins's suggestion, incorporating the amendment in UFC § 79.601(d). In effect, the amendment was tantamount to a ban on tank lining.

With little or no discussion of the leaking tank removal provision, the UFC Committee approved the revised version of Article 79. The full body of the WFCA gave the revised article final approval.

Before the WFCA officially adopted the tank removal provision, Robbins sent letters to public entities, fire officials, standard-setting organizations and customer groups informing them of the proposed amendment. Fire officials in many localities began denying Sessions's requests for permits and Sessions's business declined sharply. In the years following, Sessions's business continued to suffer.

Sessions filed a complaint in district court alleging that Joor had violated federal antitrust laws and California unfair competition laws. Ruling that Joor was shielded by *Noerr–Pennington* immunity from antitrust liability, the district court granted partial summary judgment in favor of Joor. On interlocutory review, this court substantially

upheld the district court's decision. *Sessions Tank Liners v. Joor Mfg.*, 827 F.2d 458 (9th Cir.1987). The Supreme Court, however, vacated our decision and remanded it for further consideration in light of the then-recent decision in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*, 487 U.S. 1213, 108 S.Ct. 2862, 101 L.Ed.2d 899 (1988). We remanded the case to the district court. *Sessions Tank.Liners, Inc. v. Joor Mfg., Inc.*, 852 F.2d 484 (9th Cir.1988).

After a bench trial the district court ruled that *Noerr* immunity does not protect Joor from antitrust liability. The district court focused its analysis on whether Joor's machinations in the Article 79 subcommittee constituted a "valid effort to influence government action." *Sessions*, 786 F.Supp. at 1525. Engaging in the "intensely factual inquiry" mandated by the Supreme Court's opinion in *Allied Tube*, the district court found that Robbins had knowingly made false statements to the subcommittee. It also found that Robbins had taken advantage of his affiliation with the subcommittee to promote the tank lining ban and prevent the proponents of tank lining from effectively presenting their side of the issue to the subcommittee. Concluding that Joor's conduct could not be deemed a valid effort to petition lawmakers, the district court ruled that Joor was not shielded by *Noerr* immunity. *Id.* at 1526–27.

The court found Joor liable for a violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and for the California tort of intentional interference with prospective advantage. *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*, 786 F.Supp. 1518 (C.D.Cal.1991). It is the district court's judgment against Joor that we review here.

## ISSUES ON APPEAL

In this case we are called upon to decide whether a private party can be held liable, under federal antitrust laws and the California common law, for anticompetitive restraints resulting from valid governmental action.

## DISCUSSION

### I. The Antitrust Claim

Joor contends that the district court erred in ruling that Joor is not shielded by *Noerr–Pennington* immunity from liability on the antitrust claim.

Antitrust petitioning immunity has its roots in the Supreme Court's decision in *Parker v. Brown*, 317 U.S. 341, 350, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1942). In *Parker*, the Court ruled that states cannot be held liable under the Sherman Act for anticompetitive restraints imposed "as an act of government." *Id.* at 352, 63 S.Ct. at 314. The *Parker* holding was based on the Court's conclusion that there is "nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature." *Id.* at 351, 63 S.Ct. at 313. In the absence of some stronger indication that Congress intended the Sherman Act to apply to states as well as to private parties, the Court was unwilling to subject states to antitrust liability. *Id.*

In *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Court recognized a corollary to the *Parker* state action immunity doctrine: "[T]he federal antitrust laws do not regulate the conduct of private individuals in seeking anticompetitive action from the government." *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 381–82, 111 S.Ct. 1344, 1354–55, 113 L.Ed.2d 382. The defendants in *Noerr* were a consortium of railroad executives that had conducted a successful publicity campaign designed to arouse public disfavor of the freight trucking industry in order to impair the truckers' ability to compete with the railroads. The campaign succeeded on two levels: it led to the retention, passage and enforcement of state laws limiting freight trucking, and it damaged the truckers' relationships with their customers. *Noerr*, 365 U.S. at 129–32, 81 S.Ct. at 525–27.

Hearkening to the same principles underlying the *Parker* doctrine, the *Noerr* Court ruled that the railroads could not be held

liable under the antitrust laws for effects of their campaign. *Id.* 365 U.S. at 141–43, 81 S.Ct. at 531–33; *see also Omni,* 499 U.S. at 480–81, 111 S.Ct. at 1354–55 (discussing *Noerr*); 1 Phillip Areeda & Donald F. Turner, *Antitrust Law* ¶ 204b (1978).

> Insofar as [the Sherman] Act sets up a code of ethics at all, it is a code that condemns trade restraints, not political activity, and, as we have already pointed out, a publicity campaign to influence governmental action falls clearly into the category of political activity. The proscriptions of the Act, tailored as they are for the business world, are not at all appropriate for application in the political arena.

*Noerr,* 365 U.S. at 140–41, 81 S.Ct. at 531. To impose antitrust liability on private parties for urging government action, the Court noted, would present other difficulties. It would be detrimental to democratic government because it would make citizens reluctant to inform lawmakers of their desires for laws that restrain trade, and it might offend the First Amendment right to petition the government for a redress of grievances. *Id.* at 137–38, 81 S.Ct. at 529–30.

The *Noerr* Court also rejected the proposition that petitioning immunity was limited to injuries flowing directly from governmental action. It held that the railroads were also shielded from liability for the harm the truckers suffered in their relationships with their customers. In the Court's view, that injury was "incidental" to the defendants' campaign to influence legislation. To impose liability for such incidental effects would "be tantamount to outlawing" the petitioning activity itself. *Id.* at 143–44, 81 S.Ct. at 533.[1]

The Court further defined the *Noerr* immunity doctrine in *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* the case on which the district court relied in holding Joor liable for violating the Sherman Act. The *Allied* court recognized that, if carried to its extreme, antitrust petitioning immunity could be used to shield defendants from liability for all manner of anticompetitive conduct as long as the injury claimed could be characterized as incidental to an effort to influence governmental action. The Court addressed this problem by ruling that immunity attaches only when the anticompetitive conduct at issue constitutes a *valid* effort to petition the government. 486 U.S. at 499–500, 108 S.Ct. at 1936–1937. "The validity of such efforts, and thus the applicability of *Noerr* immunity, varies with the context and nature of the activity." *Id.* at 499, 108 S.Ct. at 1936.

In applying *Allied* to Joor's conduct, the district court overlooked a key distinction between *Allied* and this case. The plaintiff in *Allied* was awarded damages only on the theory that the stigma of banning the plaintiff's product from a uniform code caused independent marketplace harm to the plaintiff in jurisdictions that permitted the use of the plaintiff's products. *Id.* at 498 n. 2, 108 S.Ct. at 1935 n. 2. In contrast, Sessions has never proved that it sustained injuries from anything other than the actions of municipal authorities. *Sessions,* 786 F.Supp. at 1532. Sessions has not shown that any potential tank lining customer in jurisdictions that were not enforcing the WFCA tank removal provision decided not to engage Sessions's services because of the WFCA's adoption of section 79.601(d). Nor has Sessions adduced any evidence that Joor's actions caused independent marketplace harm in jurisdictions that continued to permit tank lining. Unlike the plaintiff in *Allied,* Sessions was not awarded damages on the theory that Joor's "marketing the stigma" of section 79.601(d) caused Sessions any loss of business independent of the losses resulting from the permit denials. *Id.* The injuries for which Sessions seeks recovery flowed directly from government action. This fact takes the case entirely out of the realm of *Allied.*

■ Because the injuries Sessions complains of are the result of governmental action, Joor is shielded by petitioning immunity from liability under the antitrust laws. Our

---

1. In later cases, the Court recognized that *Noerr* immunity applies to attempts to influence administrative, executive and judicial action. *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

conclusion is grounded in the justification for antitrust petitioning immunity first enunciated in *Noerr* and consistently reaffirmed in later Supreme Court opinions. *See, e.g., Omni,* 499 U.S. at 380–81, 111 S.Ct. at 1354–55; *California Motor Transport,* 404 U.S. at 509–10, 92 S.Ct. at 611; *Pennington,* 381 U.S. at 669–671, 85 S.Ct. at 1593–1594. The antitrust laws promote competition by prohibiting private actors from combining or conspiring to restrain trade. 15 U.S.C. §§ 1 & 2; *Parker,* 317 U.S. at 350–51, 63 S.Ct. at 313–14; *Noerr,* 365 U.S. at 136–37, 81 S.Ct. at 529. Unlike private actors acting in combination, disinterested governmental decision-makers who take measures to inhibit competition are accountable politically and procedurally to those affected by the anticompetitive measures. *Parker,* 317 U.S. at 352, 63 S.Ct. at 314; Einer Elhauge, *Making Sense of Antitrust Petitioning Immunity,* 80 Cal.L.R. 1177, 1240–43 (1992). The policies underlying the Sherman Act do not obtain in this context.[2]

To rule otherwise and hold Joor liable for injuries flowing from governmental decision-makers' imposition of an anticompetitive restraint, we would have to find that the restraint was imposed *because of* Joor's petitioning efforts. Proof of causation would entail deconstructing the decision-making process to ascertain what factors prompted the various governmental bodies to erect the anticompetitive barriers at issue. This inquiry runs afoul of the principles guiding the *Parker* and *Noerr* decisions. *See Omni,* 499 U.S. at 377, 382, 111 S.Ct. at 1352, 1355 (rejecting suggestion that there is a conspiracy exception to petitioning immunity in cases where "government officials conspire with a private party to employ government action as a means of stifling competition" because such an exception would be "impracticable or beyond the purpose of the antitrust laws"); *Noerr,* 365 U.S. at 145, 81 S.Ct. at 533.

The district court's holding illustrates the problems that arise when private parties are held liable under the antitrust laws for injuries flowing from governmental action. In

the district court's view, the fact that Sessions's injuries flowed from local officials' refusal to grant tank lining permits did not relieve Joor of antitrust liability. Joor's actions would be shielded by *Noerr* immunity, the court reasoned, only if the permit denials could be characterized as "an 'intervening cause' breaking the link between a private party's pursuit of an anticompetitive objective and a plaintiff's injury." *Sessions,* 786 F.Supp. at 1533. The government action would be recognized as an intervening cause, the district court stated, only if invoking petitioning immunity was necessary (1) to prevent courts from second-guessing the decisions of better-informed government officials, (2) to avoid deconstructing the governmental decision-making process to determine whether a particular decision was an independent governmental action and not the result of a party's improper influence, or (3) to protect a citizen's First Amendment right to petition the government and to ensure that the government is not deprived of useful information. *Id.* at 1534. The district court concluded that none of these policy considerations applies to the present case. *Id.* And yet, the district court necessarily deconstructed the decision-making process in finding that Joor's misrepresentations regarding the safety of tank lining were the cause of the local officials' decisions to deny Sessions's requests for permits.

In addition to its dependence on deconstruction, the "intervening cause" analysis presents other difficulties. We cannot accept an interpretation of the *Noerr* doctrine that grants immunity only when the defendant's efforts to persuade government officials to impose anticompetitive restraints were not the cause of the governmental restraints actually imposed. So interpreted, the immunity shields nothing that would otherwise cause liability. Joor would be protected from antitrust liability only if the court found that the permit denials were motivated by factors wholly unrelated to Robbins' activities in the Article 79 subcommittee and his subsequent campaign to notify public officials of the tank lining ban. *See id.*

---

**2.** Sessions concedes as much in its brief when it states, "[T]he *Noerr* doctrine and its progeny rest on the premise that the Sherman Act regulates

business activity, but not political activity. Pure political activity is beyond the reach of the Sherman Act." Appellee's Brief at 3.

This approach cannot be reconciled with the principles underlying the antitrust petitioning immunity doctrine. "'[W]here a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action,' those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint." *Allied,* 486 U.S. at 499, 108 S.Ct. at 1936 (quoting *Noerr,* 365 U.S. at 136, 81 S.Ct. at 529); *accord Lawline v. American Bar Ass'n,* 956 F.2d 1378, 1383 (7th Cir.1992) (holding that defendant bar associations that had urged state supreme court to adopt bar disciplinary rules were immune from liability under Sherman Act for anticompetitive injuries resulting from court's adoption of rules); *Juster Assoc. v. City of Rutland,* 901 F.2d 266, 271 (2d Cir.1990) (holding that developer and city were immune from antitrust liability because restraint complained of was the consequence of governmental action). Immunity from liability for restraints imposed by the government attaches regardless of the "validity" of the efforts of those urging the action.[3] *See Omni,* 499 U.S. at 380–84, 111 S.Ct. at 1354–56 (rejecting suggestion that immunity from anticompetitive injuries flowing from government action does not attach when action is the result of conspiracy between defendants and governmental officials); *Noerr,* 365 U.S. at 145, 81 S.Ct. at 533 (applying petitioning immunity to private party that had "deliberately deceived the public and public officials" in lobbying campaign aimed at effecting enactment of anticompetitive legislation).

Because the only anticompetitive injuries that Sessions complains of are the direct result of governmental action, we conclude that Joor is shielded from liability for these injuries by petitioning immunity.[4]

## II. The State Law Claim

Joor asserts that the district court erred in ruling that Sessions was entitled to judgment on its claim that Joor had committed the common-law tort of intentional interference with prospective economic advantage.[5] According to Joor, any conduct shielded by the doctrine of petitioning immunity in the federal antitrust context is perforce shielded in the state common-law context.

We need not decide whether antitrust petitioning immunity and immunity under state tort law are perfectly coextensive. *See Blank v. Kirwan,* 39 Cal.3d 311, 216 Cal. Rptr. 718, 703 P.2d 58 (1985) (citing separate grounds for barring recovery on antitrust claims and tortious interference claims); *Willis v. Santa Ana Community Hospital,* 58 Cal.2d 806, 809, 26 Cal.Rptr. 640, 642, 376 P.2d 568, 570 (1962) (holding that state antitrust statutes do not supersede all common-law commercial torts). We are convinced that, in the circumstances of this case, the California Supreme Court would hold Joor immune from damages for interference with prospective economic advantage.

The California Supreme Court has carefully considered the relationship of antitrust petitioning immunity to the tort of interference with prospective economic advantage. In *Pacific Gas & Elec. Co. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 270 Cal.Rptr. 1, 791 P.2d 587 (Cal.1990) (*"PG & E"*), the Court dealt with a claim that the defendant had induced a governmental agency to initiate litigation seeking to avoid a contract to supply hydroelectric power to the plaintiff PG & E. The Court held that "to permit [this] cause of action to be stated when the only interfer-

---

3. We re-emphasize that the liability that *Allied* attached to "invalid" efforts to petition the government was liability for damages flowing from the non-governmental, independent market-place harm that the defendants' activities caused.

4. Joor raises other points of error concerning the district court's decision holding Joor liable to Sessions under the Sherman Act. Because we determine that Joor is immune from the antitrust claims, we do not reach these arguments.

5. To prevail on a claim of intentional interference with prospective economic advantage the plaintiff must demonstrate: "(1) an economic relationship between the plaintiff and some third person containing the probability of future economic benefit to the plaintiff; (2) knowledge by the defendant of the existence of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to the plaintiff proximately caused by the acts of the defendant." *Bland v. Kirwan,* 39 Cal.3d 311, 216 Cal.Rptr. 718, 703 P.2d 58, 70 (1985).

ence alleged is that defendant induced the bringing of potentially meritorious litigation would be an unwarranted extension of the scope of these torts and a pernicious barrier to free access to the courts." Id., 270 Cal. Rptr. at 2, 791 P.2d at 588. The Court approvingly recited the evolution of the *Noerr* immunity, and stated that "this doctrine relies on the constitutional right to petition for redress of grievances to establish that there is no antitrust liability for petitioning any branch of government, even if the motive is anticompetitive." *Id.* 270 Cal.Rptr. at 9, 791 P.2d at 595.

It is true that this latter statement in *PG & E* is expressly rested on the First Amendment, and Joor's entitlement under that Amendment is limited in the present case. Joor made deliberate misrepresentations in securing the amendment to the UFC; he falsely represented that the lining process would void a tank's UL certification, and he made unfounded assertions regarding the safety of tank lining and its effect on a tank's structural integrity. Those statements, of themselves, have no real claim to First Amendment protection. *See Clipper Express v. Rocky Mountain Motor Tariff Bureau*, 690 F.2d 1240, 1261–62 (9th Cir.1982), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983); *see also California Motor Trans.*, 404 U.S. at 512–13, 92 S.Ct. at 612–13 (recognizing that, in various fora, sanctions are imposed for deliberate misrepresentations).

*PG & E* recognizes, however, that the very existence of a tort action for the seeking of valid governmental action exerts an undesirable chilling effect on the access of others to government, regardless of the motives of the particular party before the court. *PG & E*, 270 Cal.Rptr. at 11, 791 P.2d at 597. Moreover, "[t]he torts of inducing breach of contract and interference with prospective advantage have been criticized as protecting the secure enjoyment of contractual and economic relations at the expense of our interest in a freely competitive economy." *Id.* For this reason, the California Supreme Court has limited the types of prospective advantage that it will protect: "a person's expectancy in the outcome of a government licens-

ing proceeding is not protected against outside interference." *Id.* 270 Cal.Rptr. at 12, 791 P.2d at 598 (citing *Blank v. Kirwan*, 39 Cal.3d at 330, 703 P.2d at 70, 216 Cal.Rptr. at 730).

The only tort involving inducement of litigation that the California Court was willing to recognize in *PG & E* was the tort of malicious prosecution, with its dual protective requirements of a lack of probable cause and a lack of success in the litigation. *Id.*, 270 Cal.Rptr. at 12, 791 P.2d at 598. If any analogy at all is to be made between the tort of malicious prosecution and that of interference with prospective economic advantage, the fact that Joor succeeded in influencing the disputed licensing decisions would preclude recovery.

Finally, we believe that the California courts, if presented with the policy considerations against deconstruction of public decisionmaking that we discussed in Part I, would find them as compelling in the tort law context as they are in the antitrust context. To impose tort liability for damages resulting from valid governmental decisions by public officials requires an examination of the motives of those officials that judges, federal or state, are reluctant to undertake. In the present case, for example, the district court found that the fire officials "relied on [Joor's] misrepresentation in denying permits to Sessions to engage in tank lining." *Sessions*, 786 F.Supp. at 1535. The same policy considerations that led the federal courts to conclude that the antitrust laws are not intended to precipitate such deconstruction of public decision-making would, we are convinced, lead the California courts to conclude that the state tort law of interference with prospective economic advantage is also not intended to permit such deconstruction.

We conclude, therefore, that the California courts would not permit recovery in this case for tortious interference with prospective economic advantage, where the damages all flow from governmental decisions of disinterested public officials. We accordingly reverse the judgment of the district court awarding such damages.

## CONCLUSION

The judgment of the district court awarding damages to Sessions under federal and state law is

**REVERSED.**

TANNER, Senior District Judge dissenting.

I believe the district court properly applied the facts of this case to the law as set forth in *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), and has correctly concluded that Joor was not shielded by *Noerr* immunity.   I dissent.