**PITTSTON COAL GROUP, INC., et al., Plaintiffs,**

**v.**

**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, Defendant.**

**Civ. A. No. 93–0162–A.**

United States District Court, W.D. Virginia, Abingdon Division.

Aug. 11, 1995.

Stephen M. Hodges, Wade W. Massie, Penn, Stuart, Eskridge & Jones, Abingdon, VA, for plaintiffs.

John R. Mooney, Beins, Axelrod, Osborne & Mooney, P.C., Washington, DC, Scott W. Mullins, Scott W. Mullins, P.C., Coeburn, VA, Robert H. Stropp, Jr., United Mine

Workers of America, Washington, DC, for defendant.

### CORRECTED MEMORANDUM OPINION

WILSON, District Judge.

This is an action pursuant to § 301 of the Labor–Management Relations Act (LMRA), 29 U.S.C. § 185, by plaintiffs, Pittston Coal Group, Inc., Thames Development, Ltd., Buffalo Mining Company, Clinchfield Coal Company, Eastern Coal Company, Elkay Mining Company, Ranger Fuel Corporation, Sea "B" Mining Company, Dante Coal Company, Jewell Ridge Coal Corporation, Kentland–Elkhorn Coal Corporation, Little Buck Coal Company, and Meadow River Coal Company (collectively "Pittston") to recover damages from defendant, International Union, United Mine Workers of America (UMWA), for breach of a collective bargaining agreement because UMWA allegedly caused Congress to enact the Coal Industry Retiree Health Benefits Act of 1992 (the "Coal Act").[1] Because the court concludes that Pittston must necessarily show the motivation of the majority who voted for passage of the Coal Act in order to prove that UMWA's lobbying caused

its passage, the court enters judgment for UMWA to avoid violating the Separation of Powers Doctrine. The court also conclusively presumes that Congress is the legal cause of its enactments, and therefore, the damages that Pittston seeks.[2]

### I.

In 1990, after a protracted labor dispute, Pittston and UMWA entered into a Memorandum on Retiree Health Care Legislation (the "agreement") that prohibited UMWA from supporting or lobbying for legislation that would require Pittston to pay back contributions to certain health benefit plans. UMWA agreed not to support any legislation that had the same "purpose or effect" of Part B of S.1708 of the 101st Congress, then pending in Congress.[3]

> To foster the development of a mutually acceptable alternative, the Union has committed to the Pittston Coal Group Companies that it will no longer seek, and will actively oppose, any legislation that has the purpose or effect of Part B of S.1708.

(Def.'s Ex. 7.)

Three years after this agreement, Congress enacted the Coal Act.[4] Pittston as-

---

1. The Union also argues that its agreement with Pittston is void as a matter of public policy. Although important First Amendment concerns are raised, the court finds it unnecessary to address that issue. *See Davies v. Grossmont Union High School Dist.*, 930 F.2d 1390 (9th Cir.1991); *Leonard v. J.E. Clark*, 12 F.3d 885 (9th Cir.1993).

2. In an earlier opinion, the court denied UMWA's Motion to Dismiss and found that Pittston stated a claim for breach of contract. *Pittston Coal Group, Inc. v. International Union, United Mine Workers of America*, No. 93–0162 (W.D.Va. filed July 27, 1994). The court noted that even if Pittston were unable to establish the causation necessary for recovery of compensatory damages, Pittston might be entitled to an alternative remedy, including nominal damages. But the court expressed misgivings because the suit potentially could intrude upon congressional prerogatives.

   At the hearing on the motion for summary judgment, Pittston's counsel stated: "money damages for breach of contract [is what we seek]. No other relief is sought in this case." (Hearing on Motion for Summary Judgment, May 9, 1995.) In light of Pittston's demand for compensatory damages arising from its Coal Act obligations and its causation problems, it is clear

that the court under-valued potential intrusions upon the Separation of Powers Doctrine.

3. S.1708 was a bill introduced by Senator John D. Rockefeller, IV "to provide for the stabilization of the process of providing coal industry health benefits...." (Pl.'s Ex. 2.) The bill financed health care for Union retirees in two ways. First, it allowed transfers from the overfunded Union pension funds to the health funds. Second, it imposed a continuing obligation to pay on all employers who had signed the prior national agreement with the Union. By "Part B," the parties meant the section of the bill that imposed an obligation to pay, as opposed to the part that authorized transfers between the funds.

4. The Coal Act, as its legislative history demonstrates, was the product of an extensive and thorough legislative effort to address perceived deep-rooted problems in the retiree health care system. *See Templeton Coal Co., Inc. v. Shalala*, 855 F.Supp. 990, 997 (S.D.Ind.1993)("Following the settlement of [the] strike, the Secretary of Labor, Elizabeth Dole, formed the Coal Commission ... to examine and report on this problem."); *Blue Diamond Coal Co. v. Shalala*, 174 B.R. 722 (E.D.Tenn.1994) (" [T]he Coal Act must be viewed as a rational legislative response to a

serts that provisions of the Coal Act have the same purpose or effect as Part B of S.1708, and that UMWA actively sponsored and supported enactment of these Coal Act provisions in violation of the agreement. Pittston seeks compensatory damages of approximately $120,000,000, the amount of its liability for back contributions to the benefit plans caused by the passage of the Coal Act.

## II.

■■■ Judicial enforcement of an agreement that premises the recovery of damages on proof that particular lobbying caused particular federal legislation or discreet aspects of that legislation would embroil the court in congressional prerogatives in violation of the Separation of Powers doctrine. Ascertaining congressional *intent*—what congress intended to say—from legislative history, rather than from legislative text is an uncertain process. Divining legislative *motive*—why congress said what it said—from whatever

source, is particularly ill suited to judicial resolution. "The Supreme Court has long recognized that judicial inquiries into legislative motivation are to be avoided. Such inquiries endanger the separation of powers doctrine, representing a substantial judicial 'intrusion into the workings of other branches of government.'" *South Carolina Educ. Ass'n v. Campbell,* 883 F.2d 1251, 1257 (4th Cir.1989) (quoting *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 268 n. 18, 97 S.Ct. 555, n. 18, 50 L.Ed.2d 450 (1977)). *See United States v. O'Brien,* 391 U.S. 367, 383–84, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1967) ( "Inquiries into congressional motives or purposes are a hazardous matter.... What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."). Yet, divining legislative motive is precisely what Pittston seeks in this lawsuit.[5] Pittston claims that it was

crisis in the coal retiree health benefits. It is the product of legislative thought, analysis and compromise and there is no evidence that Congress acted arbitrarily or without prior substantive investigation and debate").

5. Pittston attempted to depose Marisa Spatafore, a former aide to Senator Rockefeller, and have her "authenticate [two] memos [originating from Senator Rockefeller's office] and answer some questions concerning them." (Letter of Pl.'s counsel, March 28, 1995.) The court found that the Speech or Debate Clause prohibited the examination, granted a protective order, and quashed the subpoena. Although the entry of judgment moots the issue, the court memorializes its decision because the course of litigation highlights actual, unavoidable, yet impermissible, intrusion on the Separation of Powers Doctrine.

The Speech or Debate Clause provides that "[F]or any Speech or Debate in either House [Senators and Representatives] shall not be questioned in any other place." U.S. CONST., art. I, § 6, cl. 1. The Clause protects legislative independence within the "legitimate legislative sphere," *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 503, 95 S.Ct. 1813, 1821, 44 L.Ed.2d 324 (1975), and, "without exception," the Supreme Court has "read the ... Clause broadly to effectuate its purposes." *Id.* at 501, 95 S.Ct. at 1820. The Clause not only immunizes Members from suit, but also provides them with a privilege against questioning. In civil matters, the Clause shields legislators and their staffs from matters that "create[] a distraction and force[] Members to divert their time, energy,

and attention from their legislative tasks to defend the litigation." *Id.* at 503, 95 S.Ct. at 1821.

The court found Pittston's proposed questioning of Spatafore about internal staff memoranda prohibited by the Clause. Communication between congressional legislators or between congressional legislators and their aides, is "an integral part of the ... communicative processes by which Members participate in ... House [and Senate] proceedings." *Gravel,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972). *See United Transportation Union v. Springfield Terminal Railway Company,* 132 F.R.D. 4, 6 (D.Me.1990).

Pittston argued that the Speech or Debate privilege did not apply to various documents prepared to facilitate communications with the press, and sought to have Spatafore answer questions about those materials. Mostly, Pittston relied on *Gravel v. United States,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), and *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), for support. The court found that reliance misplaced. While *Gravel* and *Hutchinson* make clear that congressional staff may be required to testify as to the circumstances of an unprotected act, "[congressional staff] may not be compelled to provide evidence that would compromise the protection extended by the Constitution to the legislative process itself." *MINPECO S.A. v. Conticommodity Services, Inc.,* 844 F.2d 856, 862 (D.C.Cir.1988). Pittston did not assert that any of the statements within the documents were actionable. Rather, Pittston sought Spatafore's testimony as evidence

damaged by UMWA's alleged breach because that breach caused passage of the Coal Act. To recover compensatory damages, Pittston endeavors to show that the Coal Act would not have passed but for UMWA's lobbying. To show that the Coal Act would not have passed but for UMWA's lobbying, Pittston must necessarily show the motivation of the majority who voted for its passage. The court finds that inquiry to be an intrusion into the workings of Congress in violation of the Separation of Powers doctrine.

### III.

Even if an intrusive inquiry into the motives of the members of Congress who voted for passage of the Coal Act was not prohibited because of the Separation of Powers Doctrine, it would be unnecessary because resolution of the case is simple and direct: the power and authority to enact federal law rests solely with Congress. U.S. CONST. art. I, § 7, cl. 2. As Congress alone is charged with the responsibility of enacting the laws of the United States, it is the sole legal or proximate cause of their enactment.

However the conduct of UMWA is viewed, the passage of the Coal Act is the superseding cause of Pittston's damages.[6]

### IV.

For the reasons stated, UMWA's Motion for Summary Judgment will be granted.

of the history of the Coal Act. The court found that information purely legislative in nature, and thus, barred the examination.

Pittston also asserted that Senator Rockefeller waived his Speech or Debate privilege because certain records were surrendered to Pittston during discovery. The court found that argument meritless. The Supreme Court has held that when the Speech or Debate privilege is invoked, "waiver can be found only after explicit and unequivocal renunciation of the protection." *United States v. Helstoski*, 442 U.S. 477, 491, 99 S.Ct. 2432, 2441, 61 L.Ed.2d 12 (1979). Although Pittston obtained the records from the Union during discovery, Pittston produced no evidence that Senator Rockefeller renounced his privilege, let alone made the "explicit and unequivocal expression" required to waive it.

6. UMWA relies on cases from antitrust law to support its contention that congressional action is the superseding cause of Pittston's injuries. *See Sessions Tank Liners, Inc. v. Joor Manufacturing, Inc.* 17 F.3d 295 (9th Cir.1994); *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220 (7th Cir.1975); *In re Airport Car Rental Antitrust Litigation*, 521 F.Supp. 568 (N.D.Cal.1981). Although the court agrees that congressional action is, indeed, the superseding cause of Pittston's injury, the line of authority relied on by UMWA is grounded on petitioning immunity rather than principles of causation. *See Sessions Tank Liners, Inc.*, 17 F.3d at 300 (causation analysis that would permit recovery upon "[p]roof of causation would entail deconstructing the decision-making process to ascertain what factors prompted the various governmental bodies to erect the anticompetitive barriers at issue," in contravention of the *Noerr–Pennington* doctrine). Essentially, in antitrust cases, the *Noerr–Pennington* Doctrine erects a barrier to liability resulting from governmental liability irrespective of whether the defendant's conduct may be said to be the cause in fact of that action. But in antitrust cases there is nothing practically or analytically to preclude a court from finding governmental action to be the superseding cause of injury. The same is true of contract enforcement actions under § 301.

Furthermore, section 301 is more than a jurisdictional statute. Under § 301 federal courts are authorized to fashion a body of common law governing the enforcement of collective bargaining agreements. *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 917–918, 1 L.Ed.2d 972 (1957); *International Union, UMWA v. Covenant Coal*, 977 F.2d 895 (4th Cir.1992). In determining legal or proximate cause in a § 301 enforcement action, the court first must necessarily confront the legal question of whether conduct *might* be said to be a proximate or superseding cause of injury. It would not advance the purpose of § 301 to encourage collective bargaining agreements that require speculative inquiries into congressional motivation.